**WAIKIKI MALIA HOTEL, INC.**, a Hawaiʻi corporation, Plaintiff–Appellee, Cross–Appellant, v. **KINKAI PROPERTIES LIMITED PARTNERSHIP**, a Delaware limited partnership, Defendant–Appellant, Cross–Appellee, and **MNS, LTD.**, a Hawaiʻi corporation, Defendant–Appellee, Cross–Appellee

NO. 15184

(CIV. NO. 89–3324)

NOVEMBER 19, 1993

MOON, C.J., LEVINSON, J., INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF KLEIN, J., RECUSED, INTERMEDIATE COURT OF APPEALS ASSOCIATE JUDGE HEEN, IN PLACE OF LUM, C.J., RECUSED,* AND CIRCUIT JUDGE ACOBA, ASSIGNED BY REASON OF VACANCY**

---

*Chief Justice Lum retired from the Supreme Court of Hawaiʻi on March 31, 1993.

**Judge Acoba was assigned to fill the vacancy created by the death of Associate Justice James H. Wakatsuki, who passed away on September 22, 1992.

372

OPINION OF THE COURT BY MOON, C.J.

This consolidated appeal involves the interpretation and enforcement of a restrictive covenant of a deed. Defendant–appellant, cross–appellee Kinkai Properties Limited Partnership (Kinkai) appeals from the amended final judgment entered pursuant to the circuit court's grant of summary judgment in favor of plaintiff–appellee, cross–appellant Waikiki Malia Hotel, Inc. (WMH) wherein the court determined that the height restriction imposed by the covenant was binding upon Kinkai, a subsequent purchaser of the property in question but not a party to the deed in which the restrictive covenant is memorialized. The amended final judgment enjoined Kinkai from constructing any building, structure, or improvement in violation of the covenant and required that Kinkai remove and demolish any such building, structure, or improvement then existing on the subject property that was in violation of the covenant.

WMH has cross–appealed from a separate order granting summary judgment in favor of defendant–appellee, cross–appellee MNS, Ltd. (MNS). MNS, an original party to the deed in which the restrictive covenant is memorialized, purchased the subject property from JMK Associates (JMK), predecessor of WMH, and subsequently sold it to Kinkai. WMH's cross–appeal is limited to the extent that it seeks to hold MNS liable in the event this court determines that MNS's successor in interest, Kinkai, is not bound by the restrictive covenant.

We conclude that because: (1) the restrictive covenant (a) is appurtenant and runs with the land, and (b) was not noted on the 1988 Transfer Certificate of Title (TCT) issued to Kinkai, and (2) WMH owns no interest in any land benefitted by the covenant, WMH cannot enforce it against Kinkai or MNS. We therefore vacate the circuit court's final amended judgment entered in favor of WMH and remand with instructions that judgment be entered in favor of Kinkai. Additionally, we affirm the circuit court's order granting summary judgment to MNS.

## I. BACKGROUND

In 1979, JMK acquired a 4,500 square foot lot in Waikiki bounded by Lewers Street, Kuhio Avenue, Royal Hawaiian Avenue, and Waikolu Way, identified on the tax map as Lot 48 (Lot 48). For purposes of this appeal, it is important to note that adjacent to Lot 48 is a parcel of land identified on the tax map as Lot 269, which was owned by Aina Luana Apartment–Hotel, Limited (Aina Luana), a wholly owned subsidiary of WMH.[1] (See diagram below.)

---

[1] In 1985, Aina Luana sold Lot 269 to the Outrigger Hotels Hawaiʻi. The Outrigger Malia Hotel (formerly the Waikiki Malia Hotel)

**Lewers Street**

**Waikolu Way**

**Kuhio Avenue**

**LOT 48**

**LOT 269**

**Royal Hawaiian Avenue**

All of the stock of JMK, WMH, and Aina Luana were owned by Joana Tom (also known as Joana Leong), Malcolm Tom, and Kenton Tom (collectively, the Toms).

On January 19, 1983, JMK sold Lot 48 to MNS because the Toms faced severe financial difficulties and needed to raise cash immediately. MNS intended to use the lot for a low rise parking structure and warehouse. Thus, in negotiating the sale price, JMK agreed to a lower offering price based upon MNS's agreement to the following height restriction, which was included in the deed (hereinafter, restrictive covenant or height restriction):

And in further consideration of the foregoing conveyance, Grantee [MNS] hereby covenants

presently sits on Lot 269. Outrigger Hotels Hawai'i subsequently conveyed Lot 269 to Lucky Hotels U.S.A. Co., Ltd.

and agrees with Purchaser [JMK[2]] its succes-
sors and assigns, that no building, structure or
improvement hereafter constructed on [Lot 48]
shall exceed the lesser of four (4) stories or forty–
five (45) feet in height. This covenant shall run
with the land for a period of twenty–five (25)
years from the date hereof and shall be binding
upon the property, the Grantee, its successors
and assigns, and all other persons who shall
have an interest in the property, including with-
out limitation, all owners, lessees, licensees,
grantees, assigns, and transferees thereof.

The deed was filed with the Land Court; however,
the restrictive covenant was not noted as an "encum-
brance" on the TCT. Thereafter, on October 17, 1984,
JMK was involuntarily dissolved by the Department of
Commerce and Consumer Affairs and JMK's general part-
ner, WMH, became its successor.

On March 23, 1988, MNS sold all of its title and
interest in Lot 48 to Kinkai. Kinkai subsequently pur-
chased additional lots adjoining Lot 48 and eventually
constructed a six–story building, which is presently the
Duty Free Shop in Waikiki.

Although the deed reflecting the 1988 conveyance
from MNS to Kinkai is not part of the record, Kinkai does
not dispute having knowledge of the height restriction. In
fact, prior to construction, Kinkai sought and received a

---

[2] The deed refers to JMK as "purchaser" and MNS as "grantee"
because, at the time of conveyance, JMK had a purchaser's interest in
the property under an agreement of sale, which was not satisfied. The
third–party grantors under the agreement of sale were Michael and
Helen Ochtyun. JMK's interest in Lot 48 under the agreement of sale
was released with its conveyance to MNS.

release of the height restriction from Outrigger Hotels Hawai'i, the then–owner of Lot 269. Kinkai believed that the restrictive covenant benefited Lot 269 because the covenant was created at a time when JMK, WMH, and Aina Luana, through the Toms, had an interest in Lot 269. The Outrigger Malia Hotel (previously known as the Waikiki Malia Hotel) is located on Lot 269 and is built upon a parking garage. The hotel rooms with views begin at approximately the forty–five foot level. Kinkai surmised that the height restriction on Lot 48 was imposed to preserve the views of the hotel rooms located on the adjacent Lot 269.

On March 24, 1988, Kinkai received a document, entitled "Consent to Exceed Height Restriction" (Consent document), from the land court, which was duly recorded on the TCT for Lot 48. This release provided that no structure located on Lot 48 could exceed sixty feet, except equipment that could not exceed seventy feet. The release further stated that the height restriction was void upon

the expiration or earlier abandonment, termination or cancellation of the height restriction contained in said Deed dated January 13, 1983, or, in the event it is determined that the owner of said Lot 269 is not entitled to the benefit of said height restriction, or, in the event that the building on said Lot 48 conforms to said height restriction.

In 1989, WMH informed Kinkai that the height restriction was not created to benefit Lot 269, but was personal to WMH, as the assignee of JMK. However, despite WMH's claim that the planned six–story building would violate the forty–five foot height restriction, Kinkai commenced construction. Thereafter, on October 26, 1989, WMH filed a complaint in circuit court against Kinkai and

MNS seeking a temporary and permanent injunction to restrain them from building any structure or improvement that violated the restrictive covenant.

MNS and Kinkai each filed motions for summary judgment. In their respective motions and in WMH's opposition thereto, the parties took the following positions:

(a) MNS maintained that the height restriction was a covenant that ran with Lot 48, and therefore, was only binding upon Kinkai. MNS also asserted that as an original covenantor, it was not personally liable for any breach by a subsequent owner of Lot 48;

(b) Kinkai argued that the burden of the height restriction ran with Lot 48 and benefitted Lot 269; therefore, only the present owner of Lot 269 could enforce the restriction. Kinkai also submitted that WMH's complaint was barred by the Consent document; and

(c) WMH took the position that if the court held that Kinkai was bound by the height restriction, then WMH would concede that MNS was not liable because WMH would be able to obtain sufficient relief against Kinkai. However, if the court was persuaded by Kinkai's position, WMH maintained that it would be inequitable to excuse MNS from liability for the breach of the height restriction merely because MNS sold Lot 48 to Kinkai, a third party who might have been able to except the effect of the height restriction. WMH also asserted that JMK was entitled to enforce the height restriction and that WMH could not be bound by the Consent document because it was not a party to the land court proceedings.

The circuit court granted MNS's motion for summary judgment on all of WMH's claims, thereby eliminating

MNS from the action. The court, however, denied Kinkai's motion for summary judgment holding that "the benefit associated with the covenant restricting the building height on Lot 48 was clearly intended to favor JMK, its successors and assigns," and that WMH's claims were not barred by the Consent document.

Kinkai submitted a motion for reconsideration of the circuit court's denial of its motion for summary judgment and alternatively moved to dismiss WMH's complaint on the ground that the circuit court erred in holding that the law of this jurisdiction permitted the benefit of a restrictive covenant to be held in gross. The motion was denied.

Subsequent to the denial of Kinkai's motion for summary judgment, WMH moved for summary judgment and a "final injunction" against Kinkai to prohibit it from constructing any building, structure, or improvement on Lot 48 that was in violation of the restrictive covenant. WMH maintained that, in light of the court's prior rulings, it was entitled to enforce the forty–five foot height restriction because "Kinkai had actual and constructive notice of the height restriction" but chose to disregard it when it proceeded with construction. In opposition, Kinkai asserted, *inter alia*, that the covenant was not enforceable because the 1988 TCT issued to it did not note the height restriction. The circuit court granted the motion and ordered that "Kinkai . . . remove and demolish any building, structure, or improvement now existing on *said property* which exceeds the . . . height limitation." (Emphasis added.) Final judgment in favor of WMH was entered on January 23, 1991.

Pursuant to motions properly brought before it, the circuit court subsequently: (1) entered an amended final judgment specifically to clarify that the reference to "said

property" in the January 23 final judgment referred only to "Lot 48"; and (2) stayed enforcement of the amended final judgment.

Kinkai appealed the final judgment of January 23, 1991, which was filed under case No. 15184. Kinkai then appealed the amended final judgment, which was filed under case No. 15364.[3] WMH cross–appealed the entry of summary judgment in favor of MNS in both cases. By order of this court, both appeals have been consolidated for review and disposition under case No. 15184.

## II. STANDARD OF REVIEW

The standard to be applied by the appellate court in reviewing a grant or denial of summary judgment is identical to that employed by the trial court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992); *Cuba v. Fernandez*, 71 Haw. 627, 631, 801 P.2d 1208, 1211 (1990); *Feliciano v. Waikiki Deep Water, Inc.*, 69 Haw. 605, 607, 752 P.2d 1076, 1078 (1988). Summary judgment is proper when there is no genuine issue as to any material fact and the moving party demonstrates that it is entitled to judgment as a matter of law. HRCP Rule 56(c); *Gossinger v. Association of Apt.*

---

[3] We note that subsequent to the circuit court's oral ruling granting summary judgment in favor of WMH, Kinkai moved to dismiss WMH's complaint for failure to name Lucky Hotels U.S.A. Co., Ltd., the present owner of Lot 269. Kinkai asserted that Lucky Hotels was an indispensable party because it had a substantial interest in the height restriction and any judgment for injunctive relief would impair Lucky Hotel's ability to protect such interest and rights under the Consent document. The motion was denied and Kinkai also appeals from this denial. However, due to the disposition of this case, we need not address this issue.

*Owners of Regency of Ala Wai*, 73 Haw. 412, 417, 835
P.2d 627, 630 (1992).

### III. DISCUSSION
#### A. Appeal by Kinkai
##### 1. Restrictive Covenants

A covenant, as used in the context regarding the use of
property, is an agreement by one person, the covenantor,
to do or refrain from doing something enforceable by
another person, the covenantee. ROGER A. CUNNINGHAM
ET AL., THE LAW OF PROPERTY § 8.13, at 467 (1984). Every
covenant has a burden to the covenantor and a benefit
to the covenantee. Before we can answer the question of
the interpretation and enforcement of the restrictive
covenant, we must first determine the type of covenant
created.

Restrictive covenants restrain the free use of prop-
erty and are strictly construed in favor of the grantee of
the property and against the grantor. *See McKay v.
Townson*, 528 So. 2d 977, 978 (Fla. Dist. Ct. App. 1988).
The general rule does not favor restrictions imposed upon
the use of land, but rather the unrestricted use of prop-
erty. *See generally McIntyre v. Zara*, 183 W. Va. 202,
205, 394 S.E.2d 897, 900 (1990); *McGuire v. Bell*, 297
Ark. 282, 289, 761 S.W.2d 904, 908 (1988); *Sea Pines
Plantation Co. v. Wells*, 294 S.C. 266, 270, 363 S.E.2d
891, 893 (1987). The party seeking to enforce a restrictive
covenant in a deed has the burden to prove the parties'
clear intention to create a covenant that would run with
the land. *See Charping v. J.P. Scurry & Co.*, 296 S.C.
312, 314, 372 S.E.2d 120, 121 (1988).

Real covenants, also known as covenants appur-
tenant, run with the land and are required to benefit a
parcel of land known as the dominant estate. 20 AM. JUR.

2D *Covenants, Conditions, and Restrictions* § 25 at 594 (1965); Reichman, *Towards a Unified Concept of Servitudes*, 55 S. CAL. L. REV. 1179, 1286 (1982).

> A real covenant is one having for its object something annexed to, inherent in, or connected with, land or other real property – one which relates to, touches or concerns, the land granted or demised and the occupation or enjoyment thereof. A covenant is viewed as real in nature, or one that runs with the land, where either the liability to perform the duties therein enumerated or the right to take advantage thereof passes to the vendee or other assignee of the land.

20 AM. JUR. 2D § 29 at 599 (footnote omitted). In order to enforce a covenant appurtenant, a covenantee must continue to own the parcel of land benefitted by the covenant appurtenant. *Id.* § 289 at 854.

For a covenant to run with the land: (1) it must "touch and concern" the land; (2) the covenanting parties must intend it to run with the land; and (3) there must be privity of estate. ***Flying Diamond Oil Corp. v. Newton Sheep Co.***, 776 P.2d 618, 623 (Utah 1989). In other words, the covenant

> must have relation to the land or the interest or estate conveyed, and the thing required to be done must be something which touches such land, interest, or estate and the occupation, use, or enjoyment thereof. Whether a particular covenant is sufficiently connected with the use of the land to run with the land must be in many cases a question of degree. There must also be privity of estate between the parties to the covenant, and the covenant must be consistent with the estate to which it adheres and of such character that the

estate will not be defeated or changed by the performance thereof.

20 AM. JUR. 2D § 30 at 600–01 (footnotes omitted); *see also* §§ 33–35. The restrictive covenant in the present case states that "no building, structure or improvement hereafter constructed on said property shall exceed the lesser of four (4) stories or forty–five (45) feet in height." Clearly, the covenant meets the touch–and–concern requirement because it relates to the use of the land and the ownership interest in it. *See Flying Diamond Oil*, 776 P.2d at 623. For a covenant to run with the land, it must extend to the land so that the condition required to be performed affects the quality or value of the land. *Gallagher v. Bell*, 69 Md. App. 199, 209, 516 A.2d 1028, 1033 (1986) (citation omitted). Here, Lot 48 is burdened and its value diminished because any buildings, structures, or improvements thereon cannot exceed the lesser of four stories or forty–five feet in height. It is in this respect that the covenant "touches and concerns" the land. *See Flying Diamond Oil*, 776 P.2d at 623.

Second, the original covenanting parties must have intended the covenant to run with the land. Whether restrictions imposed upon the land by a grantor impose a personal obligation or a servitude upon the land is determined from the parties' intentions at the time the deed containing the restriction was delivered. *Stegall v. Housing Auth. of Charlotte, N.C.*, 278 N.C. 95, 100, 178 S.E.2d 824, 828 (1971); *see generally Collins v. Goetsch*, 59 Haw. 481, 583 P.2d 353 (1978).

When construing a restrictive covenant, the parties' intentions are normally determined from language of the deed. *Stegall*, 278 N.C. at 100, 178 S.E.2d at 828. Although the express language of the covenant in this case provides that it "shall run with the land," the

covenant does not indicate who or what was intended as the beneficiary of the imposed height restriction, and to that extent, the covenant is ambiguous. Substantial doubt or ambiguity is resolved against the person seeking its enforcement. *McKay*, 528 So. 2d at 978; *Gey v. Beck*, 390 Pa. Super. 317, 324, 568 A.2d 672, 675 (1990); *Sea Pines Plantation Co.*, 294 S.C. at 270, 363 S.E.2d at 894. If the language of the deed is ambiguous, surrounding circumstances may be considered but not parol evidence. *Stegall*, 278 N.C. at 100, 178 S.E.2d at 828. Because the covenant is unclear as to its intended beneficiary, we look to the circumstances surrounding the creation of the covenant. The use of surrounding circumstances, also known as extrinsic evidence, "usually concerns the geographical location of the lands and the physical condition of the structures thereon." 2 AMER. LAW OF PROP. § 9.29, at 417 (1952).

In the case before us, we first note that at the time the covenant was created, the Toms owned both Lot 48 through JMK and Lot 269 through Aina Luana, and the interests of these partnerships and corporations were closely bound. Second, the restrictive covenant prohibits the construction of any building, structure or improvement on Lot 48 above the lesser of four stories or forty–five feet in height. Interestingly, the hotel rooms with views on adjacent Lot 269 begin at approximately the forty–five foot level. Taken as a whole, we believe the extrinsic evidence strongly implicates an intent by JMK, through its owner, the Toms, to have the covenant run with Lot 48 and the benefit to run with Lot 269.

Further, proof of such an intent can be gleaned from language used in the covenant.

> In jurisdictions which refuse to raise any presumption in favor of the benefit being

appurtenant to the retained land of the promisee, proof of the intention of the parties to the agreement becomes a necessary element of the complainant's case. Such an intention is clearly shown where the agreement itself expressly designates the land with which the benefit is to run to subsequent land owners. Likewise, *the use of the phrase "and assigns" or "and heirs" following the name of the promisee has in several cases been held material evidence of an intention to create a benefit appurtenant.*

2 AMER. LAW OF PROP. § 9.29, at 416 (footnotes omitted) (emphasis added). The restrictive covenant at issue specifically states that "Grantee [MNS] covenants and agrees with Purchaser [JMK], *its successors and assigns,*"[4] and that "[t]his covenant . . . shall be binding upon the property, including without limitation, all owners, lessees, licensees, grantees, assigns, and transferees thereof[,]" further indicating the intention to create a covenant appurtenant.

Finally, there must be privity of estate for a covenant to run with the land. Generally, "privity of estate requires a particular kind of relationship between the original covenantor and the covenantee." *Flying Diamond Oil*, 776 P.2d at 628. There are three types of privity:

(1) mutual, *i.e.*, a covenant arising from simultaneous interests in the same land; (2) horizontal, *i.e.*, a covenant created in connection with a conveyance of an estate from one of the parties to another; and (3) vertical, *i.e.*, the devolution of

---

[4] *See supra* note 2.

an estate burdened or benefitted by a covenant from an original covenanting party to a successor.

*Id.* " '[Vertical privity] arises when the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefited or burdened.' " *Flying Diamond Oil*, 776 P.2d at 628 n.12 (quoting 5 R. POWELL, THE LAW OF REAL PROPERTY ¶ 673[2][c], at 60–64 (1988)). Here, Kinkai, the party subject to the burden, is a successor to MNS, the original party so burdened. Kinkai's purchase of Lot 48 from MNS established vertical privity.

We therefore hold that the restrictive covenant at issue is a covenant appurtenant running with the land. We further hold that WMH is unable to enforce the covenant against Kinkai because WMH no longer owns nor does it have any interest in Lot 269, the benefitted parcel.

We reject WMH's contention that the covenant unambiguously provided for the benefit to be personally held by JMK, its successors and assigns, thereby creating a covenant in gross. A restrictive covenant in gross arises when the covenant does not benefit a specific parcel of land and the benefit is held personally by the grantor. G. KORNGOLD, PRIVATE LAND USE ARRANGEMENTS § 9.15, at 332 (1990); Korngold, *For Unifying Servitude and Defeasible Fees: Property Law's Functional Equivalents*, 66 TEX. L. REV. 533, 552 (1988). We note that there are strong policy reasons why covenants in gross are disfavored. *See* KORNGOLD, PRIVATE LAND USE ARRANGEMENTS § 9.15, at 335 (citing cases). First, they affect the marketability of the land because it is more difficult to trace the holder of a covenant in gross, inasmuch as that person could be located anywhere; on the other hand, it is fairly easy to locate the holder of interest of an appurtenant covenant. *Id.* § 9.15, at 332. Second, appurtenancy requirements

help to limit "the power of the dead hand" and reduce the amount of veto rights that could be exercised against the current land owner because the number of appurtenant covenants would be restricted to the particular properties near the burdened tract of land. *Id.* at 333. Third, covenants in gross allow an outsider to impose his or her views on a community; and finally, appurtenant covenants increase flexibility in enforcing and applying covenants and promote flexible consensual land use arrangements. *Id.*; *see also For Unifying Servitude and Defeasible Fees*, *supra*, 66 TEX. L. REV. at 554.

As we have previously stated, restrictive covenants are strictly construed against the grantor because " '[i]t is not too much to insist that they be carefully drafted to state exactly what is intended – no more and no less.' " *Collins*, 59 Haw. at 485, 583 P.2d at 357 (citation omitted). Because the covenantee who personally holds the benefit of a covenant in gross may be geographically removed from the particular area burdened by the covenant, yet may still exercise control over the use of land in such area, we believe that the covenant must clearly and expressly reflect the intent to create a covenant in gross.

As this court has stated,

> [t]he "critical time" for determining whether there was a sufficient understanding of the covenants on the part of the purchasers with regard to the meaning intended by the original grantors is the time of purchase. Otherwise, there would be nothing to prevent the original grantors from subsequently altering or diminishing the purchasers' ownership rights in the land.

*Collins*, 59 Haw. at 490, 583 P.2d at 359. The express language of the covenant fails to clearly and expressly reflect

the intent that JMK would hold the benefit of the covenant personally. Thus, we conclude that a covenant in gross was not created.[5]

Despite the ambiguity of the covenant, the extrinsic evidence demonstrates that a covenant appurtenant was created. We note that WMH freely acknowledges that "Kinkai correctly points out that [WMH] does not own any land which the height restriction could benefit." Thus, we hold that WMH cannot enforce the restrictive covenant at issue against Kinkai.

## 2. **Transfer Certificate of Title**

Kinkai also argues that because the height restriction is not noted on the 1988 TCT issued to it for Lot 48, WMH is unable to enforce the restrictive covenant. We agree and hold that even if WMH, through Aina Luana and the Toms, still possessed an interest in Lot 269, the benefitted parcel of the covenant appurtenant, or even if the covenant was in gross, WMH would be unable to enforce the covenant because it was not noted on the 1988 TCT.

Hawai'i's statutory law governing Land Court registration provides that encumbrances be "noted" on the TCT.

> Every applicant receiving a certificate of title in pursuance of a decree of registration, and every subsequent purchaser of registered land who takes a certificate of title for value and in good faith, hold the same free from all encumbrances

---

[5] Due to this conclusion, we need not review WMH's arguments regarding the enforceability of a covenant in gross. Likewise, we do not pass upon WMH's citation to the DRAFT Restatement (Third) of Property in support of its position that covenants in gross are enforceable.

> *except those noted on the certificate in the order of*
> *priority of recordation[.]*

HRS § 501–82 (1985) (emphasis added).

In the present case, there is no dispute that the restrictive covenant is not noted on the 1988 TCT as an encumbrance. Instead, the Consent document was noted on the TCT under "encumbrances" as follows:

| Document # | Class | In Favor of/Terms |
|---|---|---|
| 1555821 | Consent | By Outrigger Hotels Hawai'i, to the construction of Bldg, in access [sic] of height restriction contained in Doc 1148199 |

The question presented for our review is whether this reference to the consent constitutes a "notation" of the height restriction under HRS § 501–82.

We first acknowledge WMH's opposing argument that,

> [t]he TCT which Kinkai put before the court . . .
> mentions the height restriction and sets forth the
> number of the filed document which contains it.
> This reference is an adequate notation of the
> height restriction. Moreover, the very Deed by
> which Kinkai acquired the property specifically
> states that the conveyance and grant were subject
> to the restriction.

However, Kinkai's admission to having knowledge of the height restriction is of no consequence because such knowledge was not obtained from the information contained on the TCT.[6] "[K]nowledge of an unregistered

---

[6] Although WMH asserts that the height restriction was listed on the deed to Kinkai for Lot 48, as noted previously, this deed is not in the record.

encumbrance does not disqualify the holder of a certificate of title from the protection afforded him by the title registration statute." *Honolulu Memorial Park, Inc. v. City and County of Honolulu*, 50 Haw. 189, 192, 436 P.2d 207, 209 (1967). Signficantly, we have stated:

> If, as we hold, a certificate of title is unimpeachable and conclusive except as otherwise provided by law, it would be illogical to say that it may be impeached if the purchaser for value had knowledge of an existing unregistered encumbrance. To do so would be to rob a certificate of title of its conclusive and unimpeachable character and place it in the same category as the ordinary record in the bureau of conveyances. If the intent and purpose of the law pertaining to the registration of land titles is to be preserved, the integrity of certificates of title must be scrupulously observed and every subsequent purchaser of registered land who takes a certificate of title for value, except in cases of fraud to which he is a party, is entitled under the provisions of [Revised Laws of Hawai'i 1935] section 5401 [(predecessor of HRS § 501–82)] to hold the same free from all encumbrances except those noted on the certificate and the statutory encumbrances enumerated.

*In re App'n of Bishop Trust*, 35 Haw. 816, 825 (1941).

The fundamental intent of HRS § 501–82 is to preserve the integrity of titles. We believe that knowledge of an unregistered encumbrance from an inference or obscure reference on a TCT is inadequate and serves only to frustrate the intent of HRS § 501–82. In order to provide the holder of the transfer certificate of title full

notice of the encumbrance from the face of the TCT, such encumbrance must be separately and clearly noted therein.

> [T]o allow the assertion of unregistered rights, be they legal or equitable, would be to subvert the obvious intent and purpose of the title registration system. The integrity of titles can only be preserved if anyone dealing with registered property is assured that the only rights or claims of which he need take notice are those which are registered in the prescribed manner. If for that reason alone, the provisions of the title registration statute must be allowed to prevail over any contravening doctrine of the common law.

*Honolulu Memorial Park*, 50 Haw. at 193–94, 436 P.2d at 210.

In the case before us, we deem the reference to the height restriction on the TCT within the document identified as a "Consent" to be an insufficient notation of an encumbrance under HRS § 501–82. The notation of the Consent document does not specifically indicate the forty–five foot height restriction. Because such restriction was never explicitly and separately noted on the 1988 TCT, we hold that Kinkai is entitled to hold Lot 48 free from such restriction. *See Packaging Products Co. v. Teruya Bros.*, 58 Haw. 580, 585–86, 574 P.2d 524, 528–29 (1978).

## B. Cross–Appeal By WMH

Because we have concluded that the trial court improperly entered summary judgment in favor of WMH, we must now direct our attention to WMH's cross–appeal against MNS. Initially, we address a jurisdictional issue raised by MNS. MNS argues that WMH lacks standing to

challenge the trial court's April 25, 1990 order granting summary judgment in favor of MNS.

Generally, the requirements of standing are: (1) the person must first have been a party to the action; (2) the person seeking modification of the order or judgment must have had standing to oppose it in the trial court; and (3) such person must be aggrieved by the ruling. *Chierighino v. Bowers*, 2 Haw. App. 291, 293, 631 P.2d 183, 185 (1981). MNS cites the third requirement in claiming that WMH lacks standing because it is not aggrieved by the trial court's order.

This court has liberally applied HRS § 641–1(a), which states that "[a]ppeals shall be allowed in civil matters from all final judgments, orders, or decrees of the circuit . . . court . . . to the supreme court," and its policy is "to permit litigants, where possible, to appeal and hear the case on the merits." *Montalvo v. Chang*, 64 Haw. 345, 350, 641 P.2d 1321, 1326 (1982) (citation omitted). We have defined an aggrieved party as "one who is affected or prejudiced by the appealable order." *Id.* at 351, 641 P.2d at 1326. We believe WMH has standing to appeal on the ground that it was aggrieved by the April 25, 1990 summary judgment order because its interest in obtaining injunctive relief against MNS increased if WMH did not prevail against Kinkai. Hence, WMH would have a valid right to challenge on appeal the summary judgment order in favor of MNS.[7]

---

[7] We note that *State v. Moniz*, 69 Haw. 370, 742 P.2d 373 (1987), cited by MNS, is distinguishable from the present case. In *Moniz*, appellants were committed to the Hawai'i State Hospital after they were acquitted of the crimes charged against them on the grounds of mental disease or disorder. *Id.* at 371–72, 742 P.2d at 375. Appellants sought permission for unescorted leave from the hospital and filed motions in the circuit court for approval. The circuit court denied the

In its cross–appeal, WMH has asserted a very limited and defined position, stating that "[i]f (and only if) the trial court's holding that the height restriction is enforceable against Kinkai was erroneous, then the trial court also erred in granting a summary judgment dismissing WMH's claims against MNS." Within this context, WMH asserts that the language of the restrictive covenant unambiguously states that it is binding upon "the Grantee [MNS], its successors and assigns." WMH further argues that it would be clearly erroneous to determine that the original covenanting parties intended for MNS to escape liability merely by selling Lot 48 to a party not bound by the agreement. On the other hand, MNS contends that a covenant that is deemed to run with the land is not binding upon an original promisor to the covenant after the promisor has divested himself or herself of his or her interest in the subject property, unless the parties intended that the original promisor would continue to be bound.

The rule in Hawai'i is that "[i]n determin[ing] . . . the meaning of language used in retrictive covenants, the controlling factor is expressed intent, and unexpressed intent is generally 'unavailing.' " *Collins v. Goetsch*, 59 Haw. at 487, 583 P.2d at 358 (citation omitted).

The restrictive covenant provides, in relevant part:

This covenant *shall run with the land* for a period of twenty–five years from the date hereof and

---

motions because it believed that court approval was only required while charges were pending under HRS ch. 707 and thus, under these circumstances, approval was unnecessary. On appeal, this court found that appellants were not aggrieved by the circuit court's dismissal of their motions and therefore lacked standing, because the circuit court's decision actually made it easier for them to receive unescorted leave by only obtaining the hospital administrator's authorization. *Id.* at 373 & n.2, 742 P.2d at 375 & n.2.

> *shall be binding upon the property, the Grantee [(MNS)], its successors and assigns, and all other persons who shall have an interest in the property,* including without limitation, all owners, lessees, licensees, grantees, assigns, and transferees thereof.

The language of the covenant expressly provides that it run with the land and that it "shall be binding upon . . . the Grantee [MNS] . . . and all other persons who shall have an interest in the property." Conspicuously absent from the covenant is an express provision that supports WMH's contention that the covenantor, MNS, has a continuing obligation to be bound by the covenant after MNS divested itself of any interest in the property.

We believe the language of the restrictive covenant is unambiguous with respect to the original promisor's continuing obligation. MNS was bound by the covenant as long as it had an interest in Lot 48. Upon divesting itself of any interest in the property by the sale to Kinkai, MNS's liability for any breach of the covenant ceased. Absent an express provision making clear an original promisor's continuing obligation, the law is clear that the promisor's obligation ends with the transfer of property. *See* RESTATEMENT (FIRST) OF PROPERTY § 538.

The rationale for holding covenants unenforceable at law against the covenantor upon the transfer of the covenantor's interest in the land is explained as follows:

> But when it comes to enforcing this contract duty [the original covenant] against the covenantor of a covenant found in a conveyance in fee, the courts have been inclined to de—emphasize the privity of contract relationship and to look only at the privity of estate liability. As a result, in a number

of recent cases it has been held that the liability of the covenantor upon the covenant ceases when he has assigned his entire estate in the burdened land. The courts reach this conclusion by construing the covenant as manifesting an intention that the contract duty, resting upon the covenantor, is to cease when he assigns the land and that liability thereafter shall rest only upon privity of estate. *This raising of an implied release is especially applicable to covenants restricting the use of the land, and even to affirmative covenants to perform a physical act upon the land, since the covenantor has no control over the land after his assignment to see that the covenants are performed.* Thus it is doubtful if the parties contemplated the continuing liability of the original covenantor under privity of contract after his assignment.

2 AM. LAW OF PROP. § 9.18 (1952) (footnotes omitted) (emphasis added).

In accordance with the foregoing, we hold that MNS, after divesting itself of title and interest in Lot 48, is not liable to any prior owner for any breach of the restrictive covenant by a subsequent owner of Lot 48.[8]

Additionally, WMH maintains that it would be inequitable to excuse MNS from liability merely because it sold Lot 48 to Kinkai. We have already concluded that a covenant appurtenant was created and that it runs with the land. We have also concluded that WMH, having no interest in any land benefitted from the covenant, does not

---

[8] Because Kinkai secured a release from the neighboring owners favored by the covenant, we need not decide what duties, if any, a seller has to ensure proper recordation of a restrictive covenant.

have the right to enforce the covenant against Kinkai. For these same reasons, we hold that WMH is unable to enforce the covenant against MNS; and therefore, the trial court's order granting summary judgment in favor of MNS must be affirmed.

## IV. CONCLUSION

Based on the foregoing discussion, we vacate the circuit court's final amended judgment entered in favor of WMH and remand with instructions that judgment be entered in favor of Kinkai. Additionally, we affirm the court's order granting summary judgment in favor of MNS.

On the briefs:

*Robert J. Faris* and *Russell L. Ching* of Gelber, Gelber, Ingersoll & Klevansky, for plaintiff–appellee, cross–appellant Waikiki Malia Hotel, Inc.

*James A. Stubenberg, Frederick W. Rohlfing III,* and *Lorrie Lee Stone,* of Stubenberg & Durrett, and *David L. Callies,* of the William S. Richardson School of Law, for defendant–appellant, cross–appellee Kinkai Properties Limited Partnership.

*Vernon T. Tashima* and *Wayne H. Tashim*a for defendant–appellee, cross–appellee MNS, Ltd.