NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough–southern judicial district
No. 2013-064


J. ALBERT LYNCH

v.

TOWN OF PELHAM

Argued: January 16, 2014
Opinion Issued: October 24, 2014


Cronin, Bisson & Zalinsky P.C., of Manchester (John G. Cronin and Daniel D. Muller, Jr. on the brief, and Mr. Cronin orally), for the plaintiff.


Donahue, Tucker & Ciandella, PLLC, of Exeter (Katherine B. Miller on the brief and orally), for the defendant.


BASSETT, J. The plaintiff, J. Albert Lynch, Trustee of FIN-LYN Trust (Trustee), appeals an order of the Superior Court (Nicolosi, J.) granting a motion to dismiss his action seeking to enforce restrictive covenants contained in a deed between the Trustee and the Town of Pelham (Town). The trial court ruled that the covenants at issue are appurtenant and personal, and that the Trustee lacked standing to enforce them. We reverse and remand.

The following facts were drawn from the plaintiff's petition, the allegations of which we accept as true for the purposes of reviewing the trial

court's order on the motion to dismiss. Elter-Nodvin v. Nodvin, 163 N.H. 678, 679 (2012). In the 1980s, Elizabeth Mills owned twenty-four acres of land in the center of the Town. After she fell ill, her daughter, Shirley Parker, attempted to sell the property. Two local developers made offers to Parker with the intent to subdivide the property into multiple building lots. Before she had acted upon either offer, Louis Fineman and J. Albert Lynch, both residents of Pelham, approached Parker about purchasing the entire tract for $300,000, with the intention to sell it to the Town rather than develop it.

Fineman and Lynch approached the Town Board of Selectmen with their proposal to purchase the property and then sell it to the Town. The Board of Selectmen told them that the Town would be willing to purchase only eighteen acres because it could not afford the entire tract. Sometime prior to the conveyance, the FIN-LYN Trust was established with Lynch as the trustee. On February 1, 1985, the property was conveyed to Lynch, as Trustee, by deed recorded in the Hillsborough County Registry of Deeds. On or about March 25, 1985, the Town Planning Board signed an approved subdivision plan for the property, also recorded in the Hillsborough County Registry of Deeds, which depicted an eighteen-acre parcel, Lot 7-237, and six one-acre building lots, Lot 7-237-1 through Lot 7-237-6, intended for single-family use. The Trustee sold the six building lots on May 1, 1985, and engaged in negotiations with the Town relative to the eighteen-acre lot.

William Hayes, the chairman of the Planning Board, negotiated on behalf of the Town. From the outset, the Trustee insisted that the eighteen-acre parcel be used only for municipal buildings, and that the Town set up a committee to study the development of town offices on the property. The Town ultimately agreed to purchase the eighteen-acre parcel for $180,000, subject to a number of restrictive covenants. The deed conveying the eighteen-acre parcel was executed on May 31, 1985. It provided, in part:

> (6) All buildings to be constructed on the land hereby conveyed shall be of Colonial architecture and shall be architecturally consistent with each other. No building shall have a flat or single pitch roof and no building shall exceed two stories in height, excluding the basement.

> (7) Within two years of the date of this deed and prior to the construction of any building or parking lot on the southern one [-]third of the land hereby conveyed, the [Town] shall plant a dense row, at least thirty (30) feet deep, of white pine, scotch pine, fir, spruce or willow trees along the southern property line of the land hereby conveyed.

> . . . .

(13)  The [Town] agrees to reconstruct and maintain the stone wall along Marsh Road and said wall may be breached only for ingress and egress.

. . . .

The land hereby conveyed is subject to and has the benefit of easements, restrictions, agreements and reservations of record, if any there be, insofar as the same may now be in force and applicable.

The deed did not specify whether the restrictions were intended to be in gross or appurtenant, and likewise did not specify a means of enforcing the restrictive covenants, such as a right of re-entry or reverter.

The Town has constructed municipal buildings on the eighteen-acre parcel, now known as the Village Green. In March 2012, the Town voted to approve construction of a new fire station on the Village Green. The design was proposed in 2011. When the plans were first presented to the Board of Selectmen, the minutes reflect that it was observed "that all of the deed restrictions and covenants encumbering the property had been covered in the proposed design; every [criterion] of the deed had been met." However, although the Town described the proposed fire station as being "designed in a traditional New England fashion, with pitched roofs, clapboard siding and double hung windows," the Trustee disagreed. By letter dated March 27, 2012, the Trustee advised the Board of Selectmen that the proposed fire station did not comport with the restrictive covenants in the deed to the Town. The Trustee filed a writ on April 20, 2012, in superior court. As of that date, the Town had not responded to the Trustee's letter, and it continued to plan for construction. At oral argument before this court, the Town represented that construction of the fire station had been completed.

In his writ, the Trustee alleged that "the portion of the new fire station constituting the garage will have a flat roof," and "portions of the new fire station will consist of poured concrete walls" rather than clapboards. The Trustee petitioned the court for declaratory and injunctive relief, claiming that: (1) the proposed fire station would violate the restrictive covenants because it is not of "Colonial architecture," in whole or in part, and has, in whole or in part, a flat roof; (2) the Town violated the deed restrictions when it failed to plant a dense row of trees along the southern boundary of the Village Green; and (3) the Town violated the covenants by failing to fully reconstruct and maintain the stone wall along Marsh Road. He also requested attorney's fees. The Town moved to dismiss, arguing that the Trustee lacked standing to enforce the restrictive covenants because the Trustee no longer owned any land near the Village Green. The Trustee responded that because the covenants are in gross,

3

he is able to enforce them.  In the alternative, the Trustee sought to amend the petition to add an abutting landowner as a party.

The trial court relied on Shaff v. Leyland, 154 N.H. 495 (2006), in ruling that, because the Trustee did not own land benefiting from the covenants, he lacked standing to enforce them.  It interpreted Shaff to hold that any deeded covenant that is not clearly labeled "in gross" — including those at issue here — is an appurtenant covenant.  The trial court also ruled that, even if it were to construe the covenants as in gross and enforceable, the Trustee had failed to allege a cognizable "legitimate interest" in enforcing the covenant.  See Restatement (Third) of Property: Servitudes § 8.1, at 474 (2000).  The court ruled that aesthetic concerns "cannot be considered legitimate where [the Trustee] does not own any nearby property."  The court found that the equities favored the unrestricted use of the Town's land as endorsed by its voters, over the aesthetic concerns advanced by the Trustee.  It also rejected the Trustee's contract-based arguments.  This appeal followed.

On appeal, the Trustee argues that the trial court erred by applying Shaff to the exclusion of other accepted principles of deed interpretation.  He argues that the pertinent covenants were in gross and supports that argument in two ways.  First, he contrasts the covenants at issue with other covenants contained in the deed that expressly identify the benefited dominant estate, arguing that those servitudes that were not expressly appurtenant were intended to be in gross.  Second, he argues that, taking into account the circumstances existing at the time of their creation, the covenants at issue were intended to be in gross.  Specifically, he argues that since the Trust had already divested itself of its other property at the time of the conveyance to the Town, it is clear that the parties did not intend the covenants to benefit a particular parcel of nearby land, but rather the residents of the community, independent of the ownership of any particular parcel.

The Trustee further argues that the trial court erred when, despite its failure to identify a specific property benefiting from those covenants, it concluded that the restrictions were covenants appurtenant.  He supports this contention by referring to the trial court's denial of his request to add an abutting landowner because to do so "would be futile."  The Trustee also challenges the trial court's conclusion that he lacked a "legitimate interest" in enforcing the covenants.  Finally, he argues that the trial court erred when it denied his request to add an abutting landowner as an additional petitioner.

The Town counters that New Hampshire's rules of deed construction favor appurtenant restrictions, and that restrictive covenants may be in gross only if the deed clearly states that the covenants created are in gross.  The Town argues that, because the deed did not specify that the restrictions were in gross, the restrictions were appurtenant, and, since Lynch, in his capacity as Trustee, owns no other land in the Town, he lacks standing to enforce the

restrictions.  The Town also contends that, even if the restrictions are in gross, the Trustee is not entitled to enforce the restrictions because he has shown no injury or damages entitling him to equitable relief.  It adds that the trial court did not unsustainably exercise its discretion by denying the Trustee's motion to amend because the deed contains no right to enforcement by third parties; thus, adding a third party would not prevent dismissal of the action.

When "ruling upon a motion to dismiss, the trial court is required to determine whether the allegations contained in the [plaintiff's] pleadings are sufficient to state a basis upon which relief may be granted." Avery v. N.H. Dep't of Educ., 162 N.H. 604, 606 (2011).  "To make this determination, the court would normally accept all facts pled by the [plaintiff] as true, construing them most favorably to the [plaintiff]." Id.  "When the motion to dismiss does not challenge the sufficiency of the [plaintiff's] legal claim but, instead, raises certain defenses, the trial court must look beyond the [plaintiff's] unsubstantiated allegations and determine, based on the facts, whether the [plaintiff] ha[s] sufficiently demonstrated [his] right to claim relief." Id. (quotation omitted).  "A jurisdictional challenge based upon lack of standing is such a defense." Id. at 607.  When "the relevant facts are not in dispute, we review the trial court's determination on standing de novo." Id.

Resolving the issues in this appeal requires interpretation of the deed from the Trustee to the Town.  "The proper interpretation of a deed is a question of law for this court." Appletree Mall Assocs. v. Ravenna Inv. Assocs., 162 N.H. 344, 347 (2011).  We review the trial court's interpretation of a deed de novo. Id.  "In interpreting a deed, we give it the meaning intended by the parties at the time they wrote it, taking into account the surrounding circumstances at that time." Id.; see also Restatement (Third) of Property: Servitudes, supra § 4.1, at 496-97.  We base our judgment on this question of law upon the trial court's findings of fact. Appletree Mall Assocs., 162 N.H. at 347.  If the language of the deed is clear and unambiguous, we will interpret the intended meaning from the deed itself without resort to extrinsic evidence. Id.  If, however, the language of the deed is ambiguous, extrinsic evidence of the parties' intentions and the circumstances surrounding the conveyance may be used to clarify its terms. Flanagan v. Prudhomme, 138 N.H. 561, 566 (1994).

We first address the trial court's conclusion that the covenants at issue were appurtenant.  "A covenant, as used in the context regarding the use of property, is an agreement by one person, the covenantor, to do or refrain from doing something enforceable by another person, the covenantee.  Every covenant has a burden to the covenantor and a benefit to the covenantee." Shaff, 154 N.H. at 497 (quotation omitted).  "The benefit and the burden of a covenant are subject to two general classifications — 'appurtenant' and 'in gross' — which themselves are subject to further classification as 'personal' or 'running with the land.'" Id. (quotation omitted).  "'Appurtenant' means that

the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land." Id. (quotation omitted). Conversely, "'[i]n gross' means that the benefit or burden of a servitude is not tied to ownership or occupancy of a particular unit or parcel of land." Id. at 498 (quotation omitted). Both "[c]ovenants appurtenant and covenants in gross can be personal or can run with the land." Id. "Running with the land means that the benefit or burden passes automatically to successors," id. (quotation omitted), whereas "'[p]ersonal' means that a servitude benefit or burden is not transferable and does not run with land." Id. (quotation omitted).

In Shaff, we observed that "[t]he general rule of construction favors appurtenant servitudes over servitudes in gross," and similarly favors construction as "personal to the covenantee and [as] enforceable only by the covenantee, unless a contrary intent is expressed in the language of the covenant." Shaff, 154 N.H. at 499. In Shaff, the original grantor petitioned the court to enforce a restrictive covenant against a grantee after the grantor had conveyed all of her interest in the original parcel. Id. at 496. The restrictive covenant stated that it "shall run with the land" but expressed "no intent regarding the benefit of the covenant or the type of covenant conveyed." Id. at 499. At the time of the conveyance, the petitioner did own land in the immediate area, and we concluded that the covenant was both appurtenant and personal. Id. Therefore, because the petitioner no longer owned land that benefited from the covenant, we held that she lacked standing to bring a claim. Id.

In Shaff, we commented that "[h]ad the respondent wished to hold the covenant in gross, regardless of whether or not she owned land in the area, she could have included language to that effect." Id. We did not, however, create a per se rule requiring all in gross covenants to be expressly stated as such in the deed.

"A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created." Restatement (Third) of Property: Servitudes, supra § 4.1(1), at 496-97; see also Red Hill Outing Club v. Hammond, 143 N.H. 284, 286 (1998) ("[F]ormalistic requirements in real estate conveyancing have largely given way to effectuating the manifest intent of the parties, absent contrary public policy or statute."). Although in Shaff we did not cite section 4.5 of the Restatement, we did apply the principles articulated in that section and its comments:

> The circumstances surrounding creation of a servitude will generally indicate whether the benefit was intended or expected to be appurtenant or in gross. The fact that the benefit serves a purpose that is only or primarily useful to the holder of a

6

particular interest in land, which was held by the original beneficiary at the time the servitude was created, strongly suggests that the benefit is appurtenant.

Restatement (Third) of Property: Servitudes, supra § 4.5 comment d at 541; cf. Shaff, 154 N.H. at 499 (concluding "that the restrictive covenant was created to personally benefit the respondent as the owner of land that benefited from enforcement of the restriction"). The parties' intent has long been the touchstone of our interpretation of contracts, including deeds. See, e.g., Joslin v. Pine River Dev. Corp., 116 N.H. 814, 817 (1976). A rule of construction, such as the preference for construing covenants as appurtenant and personal, may aid in discerning the parties' intent when there is little evidence thereof, but such a rule is not necessarily dispositive.

Here, the parties' intent can be discerned both from the circumstances surrounding the transfer as well as the plain language of the deed itself. At the time of the conveyance, the Trustee owned no other property in the Town. The deed did not identify any specific property intended to be benefitted by the covenant; thus, there was no owner to enforce the covenants. Thus, if the benefit of the covenant had been appurtenant, the restriction requiring Colonial architecture and prohibiting flat roofs would have been unenforceable from the moment that the deed was signed. Such a result would be neither logical nor consonant with the intent of the parties. Recognizing that such a circumstance can arise, the Restatement provides that, except where contrary to the parties' intent or public policy, "the benefit of a servitude is . . . in gross if created in a person who held no property that benefited from the servitude." Restatement (Third) of Property: Servitudes, supra § 4.5(1)(b), at 540; cf. B.C.E. Development, Inc. v. Smith, 264 Cal. Rptr. 55, 58 (Ct. App. 1989) ("We conclude . . . that the talisman for enforcement is not the rigid requirement of retention of an interest in land, but rests instead upon a determination of the intention of those creating the covenant.").

In addition to the circumstances of the transfer, we draw further support for our conclusion that the parties' intent was that the servitude be in gross, by comparing the covenants at issue with other covenants in the deed which are manifestly appurtenant. For example, one restriction contained in the deed provides that "[n]o Police or Fire Station shall be located within 200 feet of the rear lot lines of any single family home lot that fronts on Sawmill Road or Timber Lane," and another states that "[a] portion of the land hereby conveyed to the north of Lot 7-237-6 100 feet deep is subject to an easement for the benefit of said Lot 7-237-6 if it is necessary to properly construct and maintain a septic system for the benefit of Lot 7-237-6" if one cannot be properly constructed on Lot 7-237-6. These provisions establish both a dominant and a servient estate — that is, they explicitly identify which parcel is benefited as well as which parcel is burdened. See Arcidi v. Town of Rye, 150 N.H. 694, 698-99 (2004) (contrasting an appurtenant easement, which creates both

dominant and servient estate, with an easement in gross, which names a servient estate, but no dominant estate, because "the easement benefits its holder whether or not the holder owns or possesses other land" (quotation omitted)). But cf. Tanguay v. Biathrow, 156 N.H. 313, 316 (2007) (noting that an argument that "lack of a dominant estate does not necessarily result in an easement in gross" could have merit (brackets omitted)). We agree with the Trustee that, when considered together, the evidence that the parties created explicitly appurtenant servitudes when they so desired, and the fact that the servitudes at issue would be unenforceable if they were read as anything other than in gross, supports the conclusion that the covenants at issue were intended to be in gross.

The Town acknowledges that we have rejected the policy of strictly construing restrictive covenants. See Joslin, 116 N.H. at 817; Heston v. Ousler, 119 N.H. 58, 63 (1979). It nonetheless contends that any covenant not expressly labeled as "in gross" must be deemed to be appurtenant, regardless of the true intention of the parties at the time of the servitude's creation. The Town cites the policy reasons expressed in Waikiki Malia Hotel v. Kinkai Properties, 862 P.2d 1048 (Haw. 1993), in support of that proposition:

> Because the covenantee who personally holds the benefit of a covenant in gross may be geographically removed from the particular area burdened by the covenant, yet may still exercise control over the use of land in such area, we believe that the covenant must clearly and expressly reflect the intent to create a covenant in gross.

Waikiki Malia Hotel, 862 P.2d at 1059.

To the extent that the Town argues that we should give primacy to a rule of construction favoring appurtenant covenants over evidence of the parties' intent, we disagree. See, e.g., Tanguay, 156 N.H. at 314-15 (finding deed unambiguously created easement in gross, without stating "in gross," although grantor also owned land benefited by easement, because the grantor reserved the right "to use said land for his own use and benefit"). The Town argues that in Town of Newington v. State of New Hampshire we approved a reading of Shaff that requires courts interpreting servitudes to disregard the parties' intent or the circumstances at the time the servitude was established. See Town of Newington v. State of N.H., 162 N.H. 745, 749 (2011). To the contrary, we have long recognized "the prevailing view that cases involving restrictive covenants present such a wide spectrum of differing circumstances that each case must be decided on its own facts." Joslin, 116 N.H. at 816. Therefore, based upon the evidence of the parties' intent provided by the plain language of the deed and the context of the transfer, as well as the principles set forth in the Restatement, we conclude that the covenants at issue were in gross.

We next consider whether the Trustee can enforce the in gross covenants. Under the traditional common law theory, "[w]here a person no longer has any land in the vicinity which might be affected by the disregard of a covenant, he or she cannot enforce the restrictions." Shaff, 154 N.H. at 498 (quotation omitted). In Shaff, we contrasted this view with the one endorsed by the Restatement, "which eliminates the requirement of an ownership interest in benefited property in order to have standing to enforce a covenant in gross, instead requiring only that a holder establish a legitimate interest in enforcing it." Id. (quotation omitted). Thus, we observed that "[a]doption of this view would change the common law standing requirement for covenants in gross, but not for covenants appurtenant." Id. However, because we found that the covenants at issue in Shaff were appurtenant, that case did "not present a proper opportunity to decide whether to adopt such a rule because it [was] not necessary to our decision." Id. at 499.

Here, because we have concluded that the covenants at issue are in gross, we now have the opportunity to decide whether to adopt section 8.1 of the Restatement (Third) of Property: Servitudes. Section 8.1 provides:

> A person who holds the benefit of a servitude under any provision of this Restatement has a legal right to enforce the servitude. Ownership of land intended to benefit from enforcement of the servitude is not a prerequisite to enforcement, but a person who holds the benefit of a covenant in gross must establish a legitimate interest in enforcing the covenant.

Restatement (Third) of Property: Servitudes, supra § 8.1, at 474. By limiting enforcement rights to only those beneficiaries with "a legitimate interest in enforcing the covenant," section 8.1 effectively accomplishes many of the policy goals of the common law rule preventing enforcement of benefits in gross. As the Reporter's Note to that section explains, "[t]he traditional rule that a restrictive covenant could be enforced only by a beneficiary who owned land that would be benefited by enforcement generally operated to ensure that the beneficiary had some interest other than simply forcing the burdened land owner to pay for a release of the restriction." Id. § 8.1 Reporter's Note comment c at 488. The traditional rule "prevented enforcement by original covenantees, or their heirs, after they had disposed of the land benefited by the covenant; it prevented fortune hunters and mischief makers from buying up old covenant benefits for their nuisance value without also buying the land they were intended to benefit." Id. § 8.1 comment a at 475. "Requiring that the person seeking enforcement who does not own benefited land show some legitimate interest in enforcement of the servitude is intended to provide a substitute means of preventing opportunistic use of servitude violations for extortion or other improper purposes." Id. § 8.1 Reporter's Note comment c at 488-89. Thus, we conclude that the adoption of section 8.1 addresses the legitimate concerns of the trial court and commentators, while at the same time striking a

9

reasoned balance in permitting enforcement of covenants in gross under limited circumstances.

Having determined that these covenants are in gross, and that an entity that holds the benefit of a covenant in gross can enforce it if it can establish a legitimate interest in enforcement, we next examine whether the record establishes that the Trustee has a legitimate interest in enforcing the covenant on behalf of the trust.

The trial court found that the Trustee's concerns "relate purely to the Trust[ee]'s aesthetic taste, and cannot be considered legitimate where he," in his capacity as Trustee, "does not own any nearby property." It added, "[a]lthough the Town may have initially intended to be bound by the covenants, there is no benefit to the Town or the petitioner in continuing them," especially because a Town vote indicated general approval for the fire station proposal. The Town argues on appeal that the Trustee has no legitimate interest in enforcing the restrictive covenants. The Town contends that the property was not developed as part of an overall development scheme, and, therefore, that it is not subject to reciprocal covenants. It further states that the Trustee has not suffered economic harm attributable to the Town's construction of the fire station. We disagree with the Town and conclude that the record establishes the Trustee's legitimate interest in enforcement of the covenants.

A "legitimate interest" need not be financial. Comment c to the Restatement (Third) of Property: Servitudes § 8.1, entitled "Legitimate interest that entitles beneficiary to seek judicial enforcement," explains:

> Some covenant benefits in gross, like the benefits of conservation servitudes, are similar to appurtenant benefits in providing valuable benefits that are difficult to monetize and difficult or impossible to replace. To establish a legitimate interest in the enforcement of such a covenant, the beneficiary need not establish that he or she will suffer economic harm from covenant violation, but rather, that he or she seeks enforcement to advance the purpose for which the servitude was created.

Restatement (Third) of Property: Servitudes, supra § 8.1 comment c at 477. We view the covenants relating to the aesthetics of buildings constructed on the Village Green to be of this type. The covenants are for the benefit of the public, difficult to monetize, and difficult or impossible to replace. See id. Thus, to demonstrate a legitimate interest in enforcement, the Trustee need not demonstrate economic harm, but rather, that he seeks enforcement "to advance the purpose for which the servitude was created." Id. It is evident that the Trustee's petition was filed to advance the purpose for which the servitude was created. The petition did not seek an award of damages, but rather injunctive relief requiring the Town to "comply with the restrictive

10

covenants in its deed," as well as the award of litigation costs and fees incurred by the Trustee.

We observe that the Reporter's Note to section 8.1 discusses when a party's interest is not legitimate, thus precluding a finding of standing:

> Situations that ordinarily call for denial of standing under this rule arise where someone not otherwise connected to the burdened property or development has bought up the rights of the developer (or other original covenantor) after the developer or other covenantor has severed his or her connection to the area. Unless the claimant can demonstrate some interest other than simply extracting payment from the burdened party, standing should be denied.

Restatement (Third) of Property: Servitudes, supra § 8.1 Reporter's Note comment c at 489. Here, because the dispute is between the original grantor and grantee, and does not involve a third party who has acquired rights and now seeks to exploit them, the policy concerns giving rise to comment c are not implicated.

We conclude that the covenants at issue are in gross and enforceable by the Trustee, and that the record establishes that he has a legitimate interest in enforcing the covenants on behalf of the trust. Therefore, the trial court erred in ruling that the Trustee lacked standing. Upon remand, the trial court shall determine whether the fire station violates the restrictive covenants, and, if so, the nature of the remedy.

Reversed and remanded.

DALIANIS, C.J., and HICKS, CONBOY, and LYNN, JJ., concurred.

11