Grafton
No. 2008-749

WILLIAM SOUKUP & a.

v.

ROBERT BROOKS & a.

Argued: February 19, 2009
Opinion Issued: June 12, 2009

*Hall, Morse, Anderson, Miller & Spinella, P.C.*, of Concord (*Frank P. Spinella, Jr.* on the brief and orally), for the petitioners.

*Stan B. Brinkman*, of Woodsville, by brief and orally, for the respondents.

HICKS, J. The respondents, Robert and Kristine Brooks, appeal orders of the Superior Court (*Bornstein* and *Burling*, JJ.) granting summary judgment to the petitioners, William and Kathy Soukup, and denying summary judgment to the respondents, in this action to quiet title to property of the petitioners over which the respondents claim an easement. We reverse and remand.

The following facts were recited in the trial court's orders or appear in the record. This case involves three contiguous properties, two in Lisbon and the third in Lyman (the Lyman lot). The first two properties have direct road access, but the Lyman lot is landlocked. All three properties were at one time owned by Andrew S. Dibner. On January 21, 1992, Dibner conveyed the then-undivided parcel containing the three lots to himself as trustee of the Rock Cliff Realty Trust (Rock Cliff). Although later conveyances of the lots to the parties were technically made by Rock Cliff and executed by Dibner as trustee thereof, the parties and the trial court refer to these conveyances as having been made by Dibner and, for consistency, we will do the same.

Rock Cliff filed a subdivision plat (the plan) dividing the property into several lots, and later subdivided one of those lots into two along the Lyman/Lisbon town line. The plan was approved by the Lisbon Planning Board and recorded. It depicts an "EXISTING EASEMENT" running through the three lots at issue.

On September 15, 1995, Dibner conveyed the middle lot to the Brookses (the Brooks lot), reserving the following easement (the Dibner right of way):

> EXCEPTING, SAVING and RESERVING, as an appurtenance to the remaining land of the grantor situate in said Town of Lyman, the perpetual RIGHT and EASEMENT for all purposes, including but not limited to the passage of motor vehicle, pedestrian and animal traffic to and from said remaining land of the grantor situate in said Town of Lyman, and the construction, grading, maintenance and repair of a road, drainage, culverts, ditches, slopes and embankments, and the installation, maintenance and repair of electrical and telephone utilities above and under the ground, all upon (1) that strip of land approximately sixty (60) feet in width shown on the aforesaid plan [(the plan)] as "Existing Easement" running from the Brooks Road across Lot No. R4-5 shown on said plan through the within-described premises and through said remaining land of the grantor situate in said Town of Lyman . . . .

The lot referred to as Lot No. R4-5 is the lot now owned by the Soukups (the Soukup lot), which was at that time still owned by Dibner. Thus, as noted by the Trial Court (*Bornstein*, J.), the Dibner right of way "is described as extending across both the Soukup and [Brooks] lots, even though as the owner of the Soukup lot, Mr. Dibner did not need a right of way to cross over it."

On June 12, 1996, Dibner conveyed the Lyman lot to the Brookses, "together with" the Dibner right of way. The Brookses conveyed the Lyman lot to Robert Brooks' parents in 2002, but reacquired it after this suit was filed. Thus, the Brookses currently own both the Brooks and Lyman lots. On June 18, 1999, Dibner conveyed the Soukup lot to the Soukups. The deed to the Soukups contains no reference to the Dibner right of way.

The Soukups filed a petition to quiet title and for declaratory and injunctive relief against the Brookses, asserting that the Brookses are not entitled to make use of the alleged right of way over their property. The Brookses raised defenses of equitable estoppel and unclean hands and asked the court to declare that they "have claim of right and right to use the 'Dibner Right-of-Way' over the Soukup Lot within the scope of the original Dibner Lot language."

Both parties moved for summary judgment, which the Trial Court (*Burling*, J.) denied, finding that genuine issues of material fact existed. The parties moved for reconsideration, asserting their agreement on the relevant facts, except those related to the Brookses' affirmative defenses, and claiming that only a legal question remained at issue. The Trial Court (*Burling*, J.) then granted summary judgment in favor of the Soukups, ruling: (1) "to the extent Mr. Dibner may have attempted to create an easement over the Soukup lot for his own benefit as the owner of the Lyman lot," such an easement was unnecessary because he owned the Soukup lot and, thus, any purported easement was "extinguished through merger with his ownership interest"; and (2) "to the extent the Lyman lot, as the dominant estate, has easement rights over the [Brooks] lot, the servient estate, that easement has extinguished as well[]" because the Brookses own both lots.

The Brookses filed a motion for further hearing to address their defenses of unclean hands, unjust enrichment and various theories of estoppel. The Trial Court (*Bornstein*, J.) granted summary judgment in favor of the Soukups on each of these defenses. The Brookses now appeal.

> In reviewing the trial court's . . . grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the nonmoving party. If there is no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, the grant of summary judgment is proper. We review the trial court's application of the law to the facts *de novo*.

*Bel Air Assocs. v. N.H. Dep't of Health & Human Servs.*, 158 N.H. 104, 107 (2008) (quotation omitted).

On appeal, the Brookses argue that the trial court "erred in finding that Dibner could not create or reserve an easement over his own property as [it] completely ignored the subdivision plan creating the lots and easements in contention." The Brookses assert that "this is a clear case of the exception to the Doctrine of Merger" that applies "when land is properly subdivided according to a recorded plan."

The Brookses acknowledge the general rule of merger, but assert an exception to the rule "[w]hen an easement is created in accordance with a common, general plan or subdivision plan . . . . Under such circumstances, a valid easement is created but held in abeyance pending an out conveyance. Such an easement does not merge, nor is it invalid due to merger." They cite *Allen v. Nickerson*, 155 P.3d 595 (Colo. Ct. App. 2006), in which the court concluded that "a property owner who subdivides property with a common plan may create servitudes, including easements, burdening or benefiting the subdivision that arise upon the conveyance of individual parcels, and those servitudes are binding upon the subdivider owner and inure to purchasers with notice." *Allen v. Nickerson*, 155 P.3d at 600.

The Soukups challenge this argument on a number of grounds, including: (1) that it was not argued before the trial court; (2) that "nothing in [New Hampshire] jurisprudence supports such a 'springing' interest;" (3) that in order to have a common plan there must be reciprocal servitudes, benefiting and burdening all of the lots, which is not the case here; (4) that there is no injustice here that would justify the imposition of an implied servitude under RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 2.14 (2)(b) (2000); (5) that the easement referred to in the plan was not created by the plan; and (6) that *Allen v. Nickerson* "does not stand for the proposition . . . that the mere recording of a subdivision plan with reference to an easement constitutes an exception to the merger doctrine[]."

We first agree with the Soukups that this case does not involve reciprocal servitudes and, as such, it does not involve the implication of servitudes pursuant to RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 2.14. Rather, the Brookses assert an express appurtenant easement. We also agree with the Soukups that the plan itself did not create an easement.

 "An easement is a nonpossessory interest in real property that can be created by written conveyance, prescription or implication." *Cricklewood on the Bellamy Condo. Assoc. v. Cricklewood on the Bellamy Trust*, 147 N.H. 733, 737 (2002). Neither prescription nor implication are at issue here, and we conclude that the plan by itself is not a written conveyance. We find *Patel v. Planning Board of North Andover*, 539 N.E.2d 544 (Mass. App. Ct. 1989), persuasive on this point. In *Patel*, a recorded subdivision plan showed

a proposed easement over the plaintiffs' lot for a connecting roadway to an adjacent subdivision. *Patel*, 539 N.E.2d at 544-45. The court ruled that no easement existed, stating:

> No written deed of an easement was ever given to the town or to the owner of the abutting property. The mere approval and recording of a subdivision plan which refers to a roadway does not convey an easement in favor either of those owning property abutting the subdivision or the public generally. Nor did the deeds to the successive purchasers of [the plaintiff's lot], each of which referred to the recorded plan, create any right to an easement on the part of abutters or the public generally, as such persons were strangers to the deed. Thus, regardless of whether a future roadway connecting streets is considered an easement to the public or to the owners of the abutting property, no such easement was ever created by any express act or grant.

*Patel*, 539 N.E.2d at 546 (citations and footnote omitted). *But cf. Pearson v. Virginia City Ranches Ass'n*, 993 P.2d 688, 692 (Mont. 2000) ("[T]his Court's holdings with respect to an express easement by reservation establish that such an easement arises when the purchaser's deed refers to the plat where the easement is clearly depicted.").

■ An easement may be created, however, by a written conveyance and a plan together. In *Close v. Fisette*, 146 N.H. 480, 483 (2001), we held that an "easement agreement coupled with [an] easement plan independently created an easement." The easement agreement, signed by both the grantors and the grantees and recorded, granted the right to use a right of way shown as an existing easement on the easement plan. Although the plan itself had not been approved by the planning board and was therefore not recordable, *Close*, 146 N.H. at 482, we noted that "[t]he agreement . . . clearly references a plan, thus providing inquiry notice of its existence," *Close*, 146 N.H. at 484. We concluded that "[t]hese two documents are sufficient to create an easement." *Close*, 146 N.H. at 484. The instant case is somewhat stronger, as the plan itself is recorded; the question is whether there is a written instrument conveying or reserving the alleged easement depicted in the plan.

■ The Brookses contend that the easement over the Soukup lot was created when the Brooks lot was sold to them. Thus, we consider whether the Brooks lot deed constitutes a written conveyance of the disputed easement. The trial court ruled that Dibner could not create an easement for his own benefit over the Soukup lot while he owned it. We agree. We stated long ago:

> A man cannot have a right of way through his own land, independent of his right to the land. He may have a way through his own land at any place he may choose, and may vary it from time to time, or abandon it, as he may please, but such a way is not an easement. It is not a private way, within the proper and legal acceptation of the term, but a mere path or cart way.

*Clark v. The Boston, Concord and Montreal Railroad*, 24 N.H. 114, 118 (1851). This rule remains unchanged to the present day. *See Blaisdell v. Raab*, 132 N.H. 711, 718 (1990) (stating that "a landowner cannot have an easement over his or her own property independent from the ownership of it"). Accordingly, we agree with the trial court's ruling that Dibner did not "create[] an easement across the Soukup lot when he first reserved the right of way across the [Brooks] lot."

Nevertheless, the record reveals a second conveyance (hence a potential easement source); namely, the deed to the Lyman lot. Before ruling upon the parties' motions for reconsideration, the Trial Court (*Burling*, J.) issued an order directing the parties to file a stipulation of agreed-upon facts. The court noted the potential import of language in the Lyman lot deed:

> Specifically, the court notes that the second deed from Andrew Dibner to the respondents, by which he transferred to them the "Lyman Lot," purports to have transferred it "together with" the right of way across Mr. Dibner's remaining property. The parties have each referenced this language but have not offered any explanation of it, or its impact on the legal issue before the court. Aside from whether Mr. Dibner could have properly created an easement across his own property to begin with, or whether the merger of the Lyman and [Brooks] properties extinguished any previously existing easement, it seems this language could be construed as having created an easement even if none otherwise existed. The parties' silence on Mr. Dibner's intent may reflect their agreement on the issue, but what that agreement may be is unclear.
>
> The parties are thus instructed to file a stipulated agreement with the court indicating which facts they have agreed to within 20 days of this order.

Apparently unable to agree, the parties filed separate responses. The Soukups indicated their belief "that Dibner's intent in using this language (if he thought about it at all, which they doubt) was simply to convey to Brooks *whatever right of way Dibner may have had to access the Lyman*

*Lot,* without an intent to create any *new* right of way." The Brookses responded that the court should look "in the first instance . . . to the four corners of the deed itself as to meaning and intent before looking for intent off the deed," and then stated: "Looking at the plain language of the deed it is apparent . . . that the grantor intended to convey the Lyman lot with an easement across the 'Soukup Lot' and maintained across the 'Brooks Lot' . . . ."

In the order appealed from, the trial court only ruled upon the effect of the first deed of the Brooks lot, finding the Soukups "entitled to summary judgment on the issue of whether Mr. Dibner created an easement across the Soukup lot when he first reserved the right of way across the [Brooks] lot." The court invited the parties to file motions for further hearing if its order did not resolve all issues.

The Brookses filed a motion for reconsideration. Referencing the deed to the Brookses of the Lyman lot, the Brookses argued: "At the moment of this conveyance the Soukup lot became a servient estate to the Lyman lot which was the [dominant] estate and while part of the course of travel to the Lyman lot went [through] other lands of the grantees it was not invalid." The Brookses' motion then referred to the court's ruling that " 'to the extent the Lyman lot, as the [dominant] estate has rights over the [Brookses'] lot[], the servient estate[], that easement has been extinguished as well' " through merger. The Brookses argued that "[t]his conclusion is an oversight in that the Soukup lot is a servient estate in relation to the Lyman Lot which is the [dominant] estate and for merger to transpire there must be unity of ownership of all [dominant] and servient estates." The court denied the motion and the Brookses now raise the merger argument before us. In light of this procedural history, we consider the issues upon which we rule adequately presented below and preserved for our review.

■ As the trial court denied the motion for reconsideration without explanation, it made no explicit ruling on the import of the Lyman lot deed on the alleged easement over the Soukup lot, either as creating it, or extinguishing it. While we could remand for a ruling on this issue, because it presents solely a question of law, we choose to address it in the interest of judicial economy. *See Hilario v. Reardon,* 158 N.H. 56, 61 (2008).

> The interpretation of a deeded right of way is ultimately a question of law for this court to decide by determining the intention of the parties at the time of the deed in light of surrounding circumstances. If the terms of the deed are clear and unambiguous, those terms control how we construe the parties' intent. Thus, when the language of the deed is clear and unam-biguous, we need not consider extrinsic evidence.

*Gill v. Gerrato*, 154 N.H. 36, 39 (2006) (quotations, citations and brackets omitted). We agree with the Brookses that the Lyman lot deed is unambiguous.

■ The Lyman lot deed conveyed the Lyman lot:

> **TOGETHER WITH** the perpetual **RIGHT** and **EASEMENT** for all purposes, including but not limited to the passage of motor vehicle, pedestrian and animal traffic to and from the within-described premises, and the construction, grading, maintenance and repair of a road, drainage, culverts, ditches, slopes and embankments, and the installation, maintenance and repair of electrical and telephone utilities above and under the ground, all upon (1) that strip of land approximately sixty (60) feet in width shown on the aforesaid plan as "Existing Easement" running from the Brooks Road across Lot No. R4-5 [the Soukup lot] shown on said plan through other premises of the grantees [the Brooks lot] . . . .

Thus, the deed expressly conveys an easement over the Soukup lot, which Dibner then owned. We conclude that the Lyman lot deed unambiguously evinces Dibner's intent to convey, appurtenant to and for the benefit of the Lyman lot, an easement through both the Soukup and Brooks lots.

■ The trial court held that once the Brookses acquired the Lyman lot, the easement over the Brooks lot was extinguished through merger. We agree.

> No man can have an easement in his own land. If the dominant and servient tenements are the property of the same owner, the exercise of the right, which in other cases would be the subject of an easement, is, during the continuance of his ownership, one of the ordinary rights of property only, which he may vary or determine at pleasure, without in any way increasing or diminishing those rights. The dominant and servient tenements must, therefore, belong to different persons; immediately they become the property of one person, the inferior right of easement is merged in the higher title of ownership.

*Stevens v. Dennett*, 51 N.H. 324, 330 (1872). As the Soukup lot, however, has not come under common ownership with the Lyman lot following conveyance of the latter lot to the Brookses, the portion of the Dibner easement over the Soukup lot has not been lost through merger of title.

■ The Soukups nevertheless argue that even if there had been an easement created over their lot, "unity of title to the *Brooks* lot and the

Lyman lot suffices to destroy that claimed easement" because the common owner of the dominant estate (the Lyman lot) and the intervening land (the Brooks lot) "no longer needs an easement over the noncontiguous land in order to access the dominant estate." The Soukups contend that although "[t]heoretically, an easement appurtenant can exist even though the servient and dominant estates are not contiguous[,] . . . if they are separated by land *also* owned by the dominant estate owner, the easement can survive only when the intervening land was itself also a separate dominant estate." While they cite *York Realty v. Williams*, 52 N.E.2d 686 (Mass. 1943), for this proposition, we do not read that case as either imposing or recognizing such a requirement. In *York Realty*, the court found that the unity of title to two dominant estates did not extinguish an easement over the servient estate to both. The court stated: "That unity of title in the dominant and servient estate should operate to extinguish an easement, the ownership of the two estates should be coextensive. When a person holds one estate in severalty and only a fractional part of the other, there is no extinguishment of an easement." *York Realty*, 52 N.E.2d at 687 (quotation omitted).

The principle also holds where, as the Brookses allege here, only a portion of the servient estate is conveyed to the owner of the dominant estate. Thus, in *Fischer v. Anger*, 725 N.Y.S.2d 437 (App. Div.), *leave to appeal dismissed*, 97 N.Y.2d 653 (2001), the court noted:

> Plaintiffs contend that when Wegman's heirs conveyed . . . [a second lot to Hudelmaier], it merged with [the first lot conveyed to Hudelmaier, which was the dominant estate] and the easement was extinguished. We cannot agree. Where, as here, only a portion of the servient estate (i.e. Wegman's estate) is conveyed, there is no complete unity of title and the easement is, therefore, not extinguished.

*Fischer*, 725 N.Y.S.2d at 439 n.2; *see also* RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 7.5 (2000) ("A servitude is terminated when all the benefits and burdens come into a single ownership.").

Nor is the easement extinguished because the dominant estate (the Lyman lot) and the servient estate (the Soukup lot) are not contiguous. "[T]he prevailing view . . . is that a right of way may be appurtenant to land even though the servient tenement is not adjacent to the dominant, and even though it does not appear what the grantee's rights over the intervening land, if any, may be." *Jensen v. Ritter*, 8 Cal. Rptr. 263, 266 (Dist. Ct. App. 1960) (quotation omitted).

The Soukups argue, however, that because the Brookses own the intervening lot, there is no practical way to limit their use of the easement to accessing only the Lyman lot as opposed to the Brooks lot. Thus, they contend that ruling in favor of the Brookses would "expand[] the scope of the easement beyond what Dibner expressly intended, to make the Brooks lot a *de facto* dominant estate too[]."

"Our case law, however, does not foreclose the possibility of an easement benefiting a non-dominant tenement." *Heartz v. City of Concord*, 148 N.H. 325, 330 (2002). *Heartz* involved three parcels in Concord: 66, 66 1/2 and 68 North Main Street. Lot number 68 was owned by the Greek Orthodox Community, Inc. (GOC), which sought to purchase lot number 66 1/2 and demolish the existing structure thereon to construct a parking lot that would benefit the church located on lot number 68. *Id.* at 326. Lot number 66 1/2 was accessed through lot number 66, owned by Johnson. *Id.* On appeal, Johnson argued "that use of the easement to access the proposed parking lot is illegal because the easement will benefit a non-dominant, third-party tenement." *Id.* at 330.

As do the Soukups here, Johnson cited RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.11, for the principle: "Unless the terms of the servitude determined under § 4.1 provide otherwise, an appurtenant easement . . . may not be used for the benefit of property other than the dominant estate." We noted, however, that the deed creating the easement reserved a right of way " 'at all times and for all purposes,' " *id.* at 331, and concluded: "Because nothing in the deed's language indicates an intention to prevent non-dominant, third-party tenements from benefiting from the easement, we hold that [the] proposed use of the easement across Johnson's property is not illegal even if it benefits property beyond 66 1/2 North State Street, the dominant tenement." *Id.* at 331-32. Similarly, the Dibner right of way is, by its terms, a "perpetual **RIGHT** and **EASEMENT** for all purposes." Thus, in accordance with *Heartz*, we cannot say that use of the Dibner right of way to benefit the Brooks lot in addition to the Lyman lot would be prohibited unless such use imposed an unreasonable burden on the servient Soukup lot. *See id.* at 331-32. The Soukups, however, make no factual allegations of an unreasonable burden.

For the foregoing reasons, we hold that the deed to the Lyman lot, together with the plan, created an appurtenant easement over the Soukup lot for the benefit of the Lyman lot, and that the easement has not been extinguished by merger. We also find the absence of reference to the easement in the Soukup deed to be of no consequence:

Under the rule stated in RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 5.1, no instrument of transfer is necessary to pass servitude benefits and burdens to successors to the benefited or burdened property interests: they pass automatically on transfer of the property to which they are appurtenant. The Statute of Frauds does not require that an appurtenant servitude be mentioned in the instrument of transfer.

RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 5.1 comment *b*.

We further note that a title search of the Soukup lot would have revealed the easement. First, the Soukup deed references the plan in the following description:

> Being shown as Lots Nos. R4-5 and 4-5,1 on a "Subdivision Plat, Rock Cliff Farms, Parker Hill Road, Lisbon, N. H.," as surveyed September 1993 and revised November 1993 by Phoenix Hill Associates, approved by the Lisbon Planning Board on December 3, 1993, and recorded in the Grafton County Registry of Deeds, Plan No. 7783.

As the plan shows an "EXISTING EASEMENT" over the Soukup lot, the Soukups are "charged with notice of [the Brookses'] rights." *Frost v. Polhamus*, 110 N.H. 491, 493 (1970) (defendants on notice where, *inter alia*, "[a]lthough no specific reference was made in the deeds in defendants' chain of title to the restrictions [on use of the defendants' lot], reference was made to the recorded plan which showed the lot marked 'reserved' ").

In addition, as the "meaning and intending" clause of the Soukup deed recites, Dibner, as trustee of Rock Cliff, acquired title to the Soukup lot on January 21, 1992, as part of a larger parcel: "Meaning and intending hereby to convey a **PORTION** of the premises conveyed to Andrew S. Dibner, Trustee of the Rock Cliff Farm Realty Trust, by deed of Andrew S. Dibner dated January 21, 1992 and recorded in the Grafton County Registry of Deeds, Book 1952, Page 659." Running the grantor index for Dibner, Trustee of the Rock Cliff Farm Realty Trust, from January 21, 1992, through the date of Soukup's deed (June 18, 1999), would have revealed the out-conveyances of the Brooks lot on September 15, 1995, and the Lyman lot on June 12, 1996, which latter conveyance created the easement at issue. *See generally* 14 R. Powell, POWELL ON REAL PROPERTY § 82.03[2], [2][a], [2][b][i], at 82-70 to -77 (Michael Allan Wolf, ed., 2009) (describing mechanics of a title search); *Amoskeag Bank v. Chagnon*, 133 N.H. 11, 14 (1990) (noting purpose of New Hampshire's recording statutes is to "provide notice to the public of a conveyance of or encumbrance on real estate[,] . . .

 

[thus] serv[ing] to protect both those who already have interests in land and those who would like to acquire such interests").

For the foregoing reasons, we reverse the grant of summary judgment on the issue of the existence of an easement and remand.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.