Carroll
No. 2008-776

RICHARD MANSUR & a.

v.

DAVID MUSKOPF & a.

DAVID MUSKOPF & a.

v.

SWALLOW POINT ASSOCIATION

Argued: June 16, 2009
Opinion Issued: August 5, 2009

*Normandin, Cheney & O'Neil, PLLC,* of Laconia (*Philip P. Bonafide* on the brief and orally), for the petitioners, Richard Mansur, Susan Mansur and Clark Mansur.

*McLane, Graf, Raulerson & Middleton, P.A.,* of Manchester (*Scott H. Harris* and *Coleen M. Penacho* on the brief, and *Mr. Harris* orally), for the respondents, David Muskopf and Mary Allain.

Third-party defendant, Swallow Point Association, filed no brief.

BRODERICK, C.J. The respondents, David Muskopf and Mary Allain, appeal an order of the Superior Court (*Houran,* J.) ruling that an easement, benefiting non-waterfront property owned by petitioners Richard and Susan Mansur, extends onto the shoreline of their property along Lake Winnipesaukee. We affirm.

The following facts were recited in the trial court's orders or appear in the record. This appeal involves three lots in the Swallow Point subdivision in Moultonborough, two of which are contiguous. Swallow Point Corporation was the developer of the subdivision, and, thus, at one time was the common owner of the three lots at issue. The petitioners own lot 20, the respondents own lot 18, and Swallow Point Association (Association), the third-party defendant, owns a parcel known as the Reserved Lot. The eastern boundary of lot 18 abuts the western boundary of the Reserved Lot, and the southern boundary of both lots constitutes shoreline of Lake Winnipesaukee. Lot 20 is a non-waterfront parcel and does not abut either the Reserved Lot or lot 18. Rather, it is located in the inland portion of the subdivision, along a subdivision road that leads to the Reserved Lot.

The controversy before us centers upon the scope of an easement affording lot 20 access to the lakeshore via the Reserved Lot. The subdivision was created in the 1950s, and the present dispute is caused by a history of discrepancies regarding boundary lines set forth in a subdivision plan, subdivision deeds, and actual physical monuments and markers of various subdivision lots.

For purposes of this litigation, the chain of title for lot 20 begins with a deed dated July 30, 1958, from the developer to Joseph and Helen Ceriello. The Ceriello deed specifically includes an easement right providing access to the lake:

> Together with the right and privilege of using said Swallow Point Drive to approach the Reserved Lot, so-called, as shown on said plan, as well as the right and privilege to cross and re-cross said Reserved Lot in order to gain access to the shore of Lake

Winnipesaukee and the right to use the said shore, in common with others; said shore frontage of said Reserved Lot being 75.00 in width, more or less, as shown on said plan.

The "plan" referenced in the Ceriello deed is the 1956 "Plan of Subdivision of Swallow Point" prepared by H.D. Trojano and recorded at the Carroll County Registry of Deeds on July 20, 1957 (the Trojano plan). This plan shows the Reserved Lot as having "75 +/-" of frontage on the lake, from a concrete monument at the southeast corner of the lot. Lot 20 was later conveyed to the petitioners in 1997, by deed containing the same easement language.

For purposes of this litigation, the chain of title for lot 18 begins with a deed dated December 15, 1958, from the developer to Howard and Mary Andrews. The Andrews deed conveys the lot by metes and bounds description only, without reference to the Trojano plan. The same metes and bounds description was used in lot 18's chain of title through the 2005 deed that conveyed the property to the respondents. Unfortunately, the metes and bounds measurement of 219.1 feet for the easterly boundary abutting the Reserved Lot does not conform to the measurement of 238.78 feet for the same boundary line as shown in the Trojano plan.

The chain of title for the Reserved Lot for purposes of this litigation begins with a deed dated August 31, 1961, from the developer to all of the individuals who owned subdivision lots at that time. The Reserved Lot deed describes the parcel by referring to the Trojano Plan. That plan describes the Reserved Lot as having seventy-five feet more or less of lake frontage and having a westerly boundary, abutting lot 18, that measures 238.78 feet. The lot description remains the same in the deed that conveyed the Reserved Lot to the Association in 1997.

In sum, in 1957, the developer subdivided the Swallow Point property. In July 1958, the developer conveyed lot 20, the lot now owned by the petitioners, with an easement right to cross and recross the Reserved Lot to access the lake and to use the Reserved Lot lake shore. The deed described the lot by referring to the Trojano plan, with the shoreline measuring seventy-five feet, more or less. At this point, the developer still owned the Reserved Lot, as well as abutting lot 18, which is the lot now owned by the respondents. In December 1958, the developer conveyed lot 18 to the Andrews by deed solely describing the land by metes and bounds and without reference to the Trojano plan. At this point, the developer still owned the Reserved Lot and had not conveyed any ownership interest in the Reserved Lot to individual members of the Association. Finally, in August 1961, the developer conveyed the Reserved Lot, the lot now owned by the Association, by deed specifically referencing the Trojano plan. The

trial court found, and no one disputes, that "[a]ll deeds at issue are of record, and no question is presented as to the validity of any deed or the status of any person or entity in any relevant chain of title as a bona fide purchaser."

Precipitating the present dispute, some of the shoreline lots in the subdivision located west of lot 18 were actually developed inconsistently with the shoreline boundary markers outlined in the Trojano plan. The Trojano plan was recorded in 1957, and at some later point, the developer placed "white stake" boundary markers along a portion of the shoreline that were located substantially east of the shoreline boundaries identified in the recorded plan. Prior to 1960, certain properties were developed with reference to the white stake monuments and not with reference to the Trojano plan. Consequently, if the boundary lines identified in the Trojano plan were enforced in this area of the subdivision, property lines would run through the middle of dwellings and would isolate other dwellings from the utilities appurtenant to them. As a result of litigation, a court-approved consent decree was entered in 1991, and the boundary lines for certain lots in the subdivision were reestablished, including the boundaries between lots 17 and 18. The reestablished boundaries reflected the actual location of shoreline monuments that had been in place for more than twenty-five years at that point.

After the respondents purchased lot 18 in 2005, they began constructing a new house. The petitioners filed suit, alleging that the new building encroached on the Reserved Lot. The respondents, however, claimed ownership of the disputed land. They also sought a declaratory judgment against the Association to determine the status of the boundary line between their abutting lots. The trial court consolidated the cases. It ruled that under the easement clause in the 1958 Ceriello deed, the petitioners owned an easement to cross and recross the Reserved Lot and access seventy-five feet more or less of the lake shore, as measured from the concrete monument at the southeast corner of the Reserved Lot. The trial court also resolved the location of the shared boundary line between lot 18 and the Reserved Lot, which reduced the seventy-five-foot shoreline of the Reserved Lot as described in the Trojano plan by approximately forty-one feet. Thus, according to the trial court's order, while the respondents indeed own the land they had claimed to own, forty-one feet of their shoreline is subject to the seventy-five-foot easement owned by the petitioners. The respondents filed a motion to reconsider, which the trial court denied. The respondents appealed. The trial court's conclusion about the location of the boundary line between the Reserved Lot and lot 18 is not challenged. Additionally, while the trial court issued a ruling regarding

petitioner Clark Mansur, who owns a non-waterfront lot in the subdivision, this ruling is not challenged and plays no part in this opinion.

The respondents argue that the trial court erred in ruling that the petitioners' easement extends beyond the thirty-four-foot shoreline of the Reserved Lot to include forty-one feet of their lake frontage. They contend that once the trial court determined that the actual monuments controlled the shoreline boundary line between their lot and the Reserved Lot, the scope of the petitioners' easement must likewise be limited. According to the respondents, confining the easement to the shoreline of the Reserved Lot comports with the intent of the parties who created the easement and with the rule that when discrepancies arise, actual monuments prevail over measurements described in a deed. We disagree.

"The interpretation of a deeded right of way is ultimately a question of law for this court to decide by determining the intention of the parties at the time of the deed in light of surrounding circumstances." *Soukup v. Brooks*, 159 N.H. 9, 16 (2009) (quotation omitted). "If the terms of the deed are clear and unambiguous, those terms control how we construe the parties' intent." *Id.* (quotation omitted). As a question of law, we review the trial court's interpretation of a deed *de novo. See Tanguay v. Biathrow*, 156 N.H. 313, 314 (2007).

The easement language in the Ceriello deed is clear. It grants a right to cross and recross the Reserved Lot, including the right to "gain access to the shore of Lake Winnipesaukee and the right to use the said shore, in common with others." It identifies the Reserved Lot as that parcel shown on the Trojano plan. Both the recorded deed and the recorded plan explicitly identify the shoreline as measuring seventy-five feet in width, more or less, and the plan shows the seventy-five feet as beginning at a concrete monument that marks the southeast boundary of the Reserved Lot. At the time the easement was created, the developer owned both the Reserved Lot and abutting lot 18. Therefore, we conclude that the parties creating the easement plainly intended for the scope of the easement to include the seventy-five-foot shoreline of the Reserved Lot as it existed at that time.

The respondents contend that the seventy-five-foot shoreline measurement for the Reserved Lot identified in both the Ceriello deed and the Trojano plan conflicts with the actual monuments that separate their lot from the Reserved Lot. They argue that although the Trojano plan describes the distance between the southeast and southwest monuments for the Reserved Lot as measuring seventy-five feet, in reality the

monuments in the ground established a thirty-four foot shoreline for the Reserved Lot, and those monuments control the intended scope of the easement. This position lacks merit.

The actual monuments relied upon by the respondents did not have any legal import until the developer conveyed lot 18 in December 1958. In July 1958, when the developer first conveyed the easement in the Ceriello deed, the developer still owned both the Reserved Lot and lot 18, and, thus, at that time, the boundary line between them was established by the Trojano Plan. It was not until six months later, when the developer conveyed lot 18 to the Andrews by metes and bounds, rather than by referring to the boundaries established in the Trojano plan, that the boundary line separating the two lots effectively changed. In conveying lot 18 to the Andrews, the developer deeded a portion of the Reserved Lot as identified on the recorded Trojano plan. While this conveyance altered the boundary line between the Reserved Lot and lot 18 as identified on the Trojano plan, it did not alter the established recorded easement benefiting lot 20, the Ceriellos' lot. As the trial court correctly ruled, the developer could only convey the property to which it had title at the time. *See* 17 C. SZYPSZAK, NEW HAMPSHIRE PRACTICE, REAL ESTATE § 5.07, at 112 (2003). Moreover, easements automatically pass with the transfer of property to which they are appurtenant, even when absent from the face of the deed. *See Soukup*, 159 N.H. at 20; RSA 477:26 (2001). Therefore, the seventy-five-foot easement followed the conveyance of a portion of that shoreline to the Andrews.

The respondents emphasize that the language of the easement itself indicates that the developer only intended to create easement rights extending between the two monuments depicting the shorefront of the Reserved Lot. They maintain: "It is inconceivable that the developer intended to convey access to the lake through property other than the Reserved Lot, property that the developer intended to develop and sell to third parties." We agree that at the time the developer conveyed the easement right, the plain intent of the parties involved was to create an easement for access to the Reserved Lot shoreline. Equally plain is that such shorefront measured seventy-five feet at that time and that this measurement was specifically described in the easement language and was in accord with the Trojano plan. Therefore, the parties to that transaction intended the easement to access seventy-five feet of the Reserved Lot shorefront. The developer's subsequent intent involving the later conveyance of lot 18 to the Andrews, which intentionally or unintentionally deeded a portion of the Reserved Lot shoreline, has no bearing upon the recorded easement in the Ceriello deed. Accordingly, the trial court correctly ruled

that the petitioners have a continuing right and title under the easement clause in their deed to cross and recross the Reserved Lot to access the lake shore and to use seventy-five feet more or less of the lake shore as measured from the concrete monument of the Reserved Lot southeast corner shown on the Trojano plan.

Next, the respondents argue that the easement cannot be effective against them as bona fide purchasers because it does not exist within their chain of title. Therefore, according to the respondents, they purchased their land without notice of the encumbrance. The issue of whether the easement recorded in the Ceriello deed gave notice to a bona fide purchaser of lot 18 that a portion of the shoreline was subject to an encumbrance benefiting lot 20 is a question of law, which we review *de novo. See Soukup*, 159 N.H. at 20-21 (court conducted *de novo* review of whether title search would have revealed easement burdening land purchased by petitioners); *Greene v. McLeod*, 156 N.H. 724, 729 (2008) (on appeal, questions of law are subject to *de novo* review).

"New Hampshire is a 'race-notice' jurisdiction." *Amoskeag Bank v. Chagnon*, 133 N.H. 11, 14 (1990). Therefore, a purchaser with a senior claim in real estate must record such interest in order to prevail over a bona fide purchaser for value. *See id.* In particular,

> Every deed or other conveyance of real estate and every court order or other instrument which affects title to any interest in real estate, except probate records and tax liens which are by law exempt from recording, shall be recorded at length in the registry of deeds for the county or counties in which the real estate lies and such deed, conveyance, court order or instrument shall not be effective as against bona fide purchasers for value until so recorded.

RSA 477:3-a (2001). The recording requirement "provide[s] notice to the public of a conveyance of or encumbrance on real estate" and "serve[s] to protect both those who already have interests in land and those who would like to acquire such interests." *Amoskeag Bank*, 133 N.H. at 14.

The goal of a prospective bona fide purchaser is "to make sure he or she will obtain an interest in a property free and clear of encumbrances." *Id.* at 16. Because properly recorded instruments are deemed to give notice to prospective purchasers of any outstanding claims against property, a proper search of public records ought to reveal whether the owner of the land in fact has clear and marketable title to the property with the right to convey it. *See generally* 14 R. POWELL, POWELL ON REAL PROPERTY § 82.01[4], at 82-14 (Michael Allan Wolf, ed., 2009). A proper search of a

property's chain of title includes tracing the property back to a firm root in title and also researching the grantor index from the date that firm root is established for out-conveyances to be sure that other deeds executed by a grantor in the chain of title did not encumber the land desired by the prospective purchaser. *See generally id.* § 82.03[2][a], at 82-72 (describing mechanics of title search). Moreover, bona fide purchasers are obligated to fully investigate apparent discrepancies to determine whether title to the desired parcel is encumbered in any way. *Cf. Amoskeag Bank*, 133 N.H. at 15-16 (improperly recorded mortgage would obligate bona fide purchaser to investigate beyond the record to determine whether a properly executed and acknowledged mortgage actually exists).

◼ In this case, we conclude that a proper search of the chain of title for respondents' lot 18 would have revealed the petitioners' easement over a portion of their shorefront. The chain of title directly leads to the Andrews deed, dated December 15, 1958, and recorded on December 20, 1958. The Andrews deed contains a "meaning and intending" clause which states:

> Meaning and intending hereby to convey a portion of the premises as conveyed to Swallow Point Corporation by Mark M. Banfield by deed dated September, 1956 and recorded in Carroll County Registry of Deeds.

This language plainly informs any prospective purchasers that the parcel was subdivided from land owned by Swallow Point Corporation as the grantor. Running the grantor index for Swallow Point Corporation from September 1956 (when the developer acquired the land as identified in the clause) through the date of the conveyance of lot 18 to the Andrews (December 1958) would have revealed all of the recorded out-conveyances of the subdivision by the developer up to that point. Any of these prior out-conveyances could have affected interests in lot 18, which was then owned by the developer as the common owner.

The out-conveyance of the Ceriello deed to lot 20 from Swallow Point Corporation recorded August 20, 1958, recites nearly the same "meaning and intending" clause as the Andrews deed. This language gives at least inquiry notice to a prospective purchaser of lot 18 that both lots came from a single parcel owned by Swallow Point Corporation. Moreover, the Ceriello deed refers to the conveyed parcel as

> Lot #20 as shown on "Plan of Subdivision of Swallow Point" by H. D. Trojano, Surveyor, dated, October, 1956 and recorded in Carroll County Registry of Deeds . . . .

It also references the seventy-five-foot easement along the shoreline of the Reserved Lot as shown on the Trojano plan. Armed with information

provided in both the Andrews deed and the Ceriello deed, proper investigation would have included review of the recorded subdivision plan, revealing the following: (1) the Reserved Lot that is subject to the easement abuts the parcel described in the Andrews deed; (2) the Andrews lot is described as lot 18 in the subdivision; (3) the measurement of the boundary between the Reserved Lot and lot 18, as described in the recorded Trojano plan, does not comport with the metes and bounds description in the Andrews deed; (4) such discrepancy directly affects the location of the shoreline boundary between the properties; (5) following the shoreline boundary as described by the Andrews deed would result in the conveyance of a portion of the Reserved Lot, which was encumbered by a seventy-five-foot easement.

This case is similar to one we recently decided. In *Soukup*, a trustee of a real estate trust subdivided property into several lots and recorded the subdivision plan. *Soukup*, 159 N.H. at 11. The lots were later conveyed to different purchasers. One issue we faced was whether the owners of the so-called Soukup lot had notice of an easement burdening their land when the easement was absent from their deed but identified in another recorded deed of property conveyed by the trustee. The easement benefited the so-called Lyman lot and had been expressly conveyed and recorded in the Lyman deed. The Soukup deed included a meaning and intending clause which indicated, among other things, that the deed intended to convey a portion of land owned by the trustee. We held that proper investigation of the Soukup deed would have revealed the trustee's out-conveyances of the subdivided parcels, including the Lyman deed that had initially created the easement. *Id.* at 20-21.

Some differences exist between the facts in *Soukup* and those before us. For example, the Soukup deed identified the recorded subdivision plat which referenced the easement, whereas in the case before us the Andrews deed is silent as to the Trojano plan. *Cf. id.* at 20. However, *Soukup* stands for the proposition that bona fide purchasers are deemed to have notice of recorded interests affecting their land that have been previously conveyed by a common grantor in their chain of title. This holding is in accord with other jurisdictions. *See, e.g., Guillette v. Daly Dry Wall, Inc.*, 325 N.E.2d 572, 574-75 (Mass. 1975) (defendant's land bound by restrictions contained in recorded deeds conveying property from a common grantor). Accordingly, we hold that the respondents purchased their property with notice of the seventy-five-foot easement conveyed by and recorded in the Ceriello deed.

Finally, the respondents argue that the trial court erred in ruling that the petitioners had standing to pursue a claim of trespass because easement

rights do not grant a possessory interest in land. Given the procedural history of this case, the respondents' argument lacks merit.

Initially, separate actions existed in this matter: one with Richard Mansur, Susan Mansur and Clark Mansur maintaining an action against David Muskopf and Mary Allain; the other with David Muskopf and Mary Allain maintaining an action against Swallow Point Association and against Nancy Talbot, Susan Mansur and Margaret Richards as its directors. The Superior Court (*Brown*, J.) consolidated the cases and ruled that it would conduct a bench trial and "create one global resolution addressing the disputed issues in the two pending actions." In its subsequent order on the merits, the Superior Court (*Houran*, J.) described the parties' claims as follows:

> The defendants Mr. Muskopf and Ms. Allain are building a new house on their lot. The plaintiffs assert that the residence as it is being built encroaches on the Reserved Lot. The plaintiffs seek an order finding that the defendants are trespassing and ousting them from the Reserved Lot, and awarding the plaintiffs damages, attorney's fees and costs. In response, the defendants assert deeded rights to the property at issue, and in the alternative assert adverse possession, as well as slander of title, boundary by acquiescence, and [laches,] as well as attorney's fees and costs. The defendants also seek a declaratory judgment against the Swallow Point Association concerning the status of the boundary between the defendants' lot and the Reserved Lot.

■ Before deciding the merits, the trial court addressed whether "all claims are properly before the court" and ruled that "to the extent that the claimed trespass interferes with the Mansurs' right to use and their deeded rights to the Reserved Lot, they have standing to litigate to defend those rights." It further ruled that, by virtue of the Association's party status in the consolidated case, the boundary line dispute and "[t]he issue of the alleged trespasses by Mr. Muskopf and Ms. Allain onto the Reserved Lot is properly before this court." The court went on to decide the scope of the easement owned by the petitioners and the existing boundary demarcation between the Reserved Lot and the respondents' lot. We conclude that the record before us demonstrates that the issue of whether the respondents' actions in building a new house interfered with the petitioners' deeded easement rights was properly before the trial court.

Additionally, the respondents have failed to demonstrate that any error in the petitioners' claim being misnamed as an action in trespass caused them to incur material prejudice. *Cf.* RSA 514:8, :9 (2007); *Patenaude v. Town of Meredith*, 118 N.H. 616, 621 (1978) ("[N]ot all procedural irregu-

larities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown."). For example, they make no allegation that some lapse occurred in the proceeding below that interfered with any necessary party's ability to fully litigate the scope of the petitioners' deeded easement in relation to the location of the boundary between the Reserved Lot and the respondents' lot. Accordingly, we reject the respondents' claim of reversible trial court error.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.