Rockingham
No. 2010-170

## Appletree Mall Associates, LLC

v.

## Ravenna Investment Associates & a.

Argued: June 9, 2011
Opinion Issued: September 15, 2011

*Kalil & LaCount*, of Rye (*Michelle LaCount* and *Rachael M. Taylor* on the brief), and *Issadore & Arons, LLP*, of Norwell, Massachusetts (*Bruce A. Issadore* orally), for the petitioner.

*D'Amante Couser Pellerin & Assoc., P.A.*, of Concord (*Steven Solomon* on the brief and orally), for the respondents.

DALIANIS, C.J. The respondents, Ravenna Investment Associates and its successor-in-interest, Access Road, LLC (collectively referred to as Ravenna), appeal an order of the Superior Court (*Nicolosi*, J.) following a bench trial, which granted the petition for injunctive and declaratory relief filed by the petitioner, Appletree Mall Associates, LLC (Appletree), ordering Ravenna to restore two fifteen-foot drainage easements allowing water to discharge from Appletree's site to Route 102 in Londonderry. We reverse.

*I. Background*

The record reveals the following facts. This appeal concerns whether Appletree's lot, Lot 2, has drainage easements over Ravenna's lots, Lots 6, 7 and 10. At one time, all four lots were owned by the original developers, James Matarozzo and Howard Hirshberg. In July 1976, Matarozzo and Hirshberg received planning board approval to subdivide their Londonderry land into two large lots (Lot 2 and a lot referred to as "the Residue") and several smaller lots (Lots 5, 6, 7, 9 and 10). Their plan, referred to as Plan C-6196, depicted two fifteen-foot drainage easements.

Half of one drainage easement was located on Lot 10; the other half was located on Lot 7. Half of the other drainage easement was located on Lot 6. Plan C-6196, which was recorded in August 1976, did not indicate which lots the drainage easements were intended to benefit.

In September 1976, Matarozzo and Hirshberg conveyed Lots 2 and 6 to George C. Shaw Company (Shaw's). In 1982, Shaw's corporate successor, which for ease of reference we will also refer to as Shaw's, acquired Lots 7 and 10. Accordingly, as of 1982, all four lots at issue were in common ownership. They remained in common ownership until 1984, when Shaw's conveyed Lot 2 to Appletree's predecessor-in-interest. Ravenna acquired Lots 6, 7 and 10 from Shaw's in 2007.

In the 1980's, Lot 2 was developed as the Apple Tree Mall. Lot 2 lies northwest of Orchard View Drive in Londonderry. Historically, water has drained from Lot 2 into the town's drainage basin and then through a pipe under Orchard View Drive, which discharged onto Lots 6, 7 and 10.

Ravenna underwent an extensive design and approval process to develop Lots 6, 7 and 10 commercially. As part of the process, the town required Ravenna to grant it an easement to allow water to run off from Orchard View Drive into Ravenna's drainage system. It also required Ravenna to construct a drainage system that treated the water before it discharged onto Route 102. These requirements precluded Ravenna from piping Appletree's water across the alleged easements on Lots 6, 7 and 10 to Route 102. Additionally, Route 102's grade was altered to prevent a direct flow of water into the town's drainage ditch along Route 102.

In August 2008, Appletree brought the instant petition seeking a declaration that, as owner of Lot 2, it was entitled to drainage easements over Lots 6, 7 and 10, and an order requiring Ravenna to remove any obstructions to those easements. In its order, the trial court found that Ravenna's development of Lots 6, 7 and 10 unreasonably interfered with Appletree's alleged drainage easements. Specifically, the court found that Ravenna impermissibly relocated the easements unilaterally by routing the water over a different part of its land, instead of within the bounds of Appletree's easements. Accordingly, it granted Appletree's petition and ordered Ravenna to restore the drainage easements. This appeal followed.

## II. Analysis

On appeal, Ravenna first argues that Appletree never had drainage easements on Lots 6, 7 and 10 in the first place. Resolving this issue requires that we interpret the deeds in the conveyances to Appletree and its predecessors-in-interest and to Ravenna and its predecessors-in-interest.

The proper interpretation of a deed is a question of law for this court. *Motion Motors v. Berwick*, 150 N.H. 771, 775 (2004). As a question of law, we review the trial court's interpretation of a deed *de novo*. *Mansur v. Muskopf*, 159 N.H. 216, 221 (2009). In interpreting a deed, we give it the meaning intended by the parties at the time they wrote it, taking into account the surrounding circumstances at that time. *Thurston Enterprises, Inc. v. Baldi*, 128 N.H. 760, 765 (1986). We base our judgment on this question of law upon the trial court's findings of fact. *Arcidi v. Town of Rye*, 150 N.H. 694, 701 (2004). If the language of the deed is clear and unambiguous, we will interpret the intended meaning from the deed itself without resort to extrinsic evidence. *See Flanagan v. Prudhomme*, 138 N.H. 561, 566 (1994).

The first deed in the chain of title for Lots 2 and 6 is the 1976 deed conveying both lots to Shaw's. Referring to Plan C-6196, it stated:

> [Lot 6] is subject to a drainage easement approximately 7 ½ feet in width and running the entire westerly boundary of the said lot as shown on [Plan C-6196]. Said easement shall benefit [Lot 2] and [the "Residue"] as shown on [Plan C-6196] and shall be for the purpose of collecting surface water run-off and diverting the same to N.H. Rt. 102.

Appletree concedes that the 1976 deed did *not* create an easement on Lot 6 for Lot 2's benefit because it conveyed both the dominant estate (Lot 2) and the servient estate (Lot 6) to the same owner. *See Soukup v. Brooks*, 159 N.H. 9, 14-15 (2009). As Appletree acknowledges, a landowner cannot have an easement over his or her own property. *See id.* at 14-15; *see also* J. W. BRUCE & J. W. ELY, JR., LAW OF EASEMENTS AND LICENSES IN LAND § 3.11, at 3-34 to 3-35 (2011). Appletree argues that the source of its drainage easement on Lot 6 is the 1984 deed conveying Lot 2 to its predecessor-in-interest.

The first deed in the chain of title for Lots 7 and 10 was the 1982 deed to Shaw's. The trial court ruled that the 1982 deed was the source of Appletree's easements on Lots 7 and 10. The 1982 deed conveyed Lot 7 "subject to a drainage easement along the northeasterly boundary of said Lot" as shown on Plan C-6196 and conveyed Lot 10 "subject to a drainage easement along the southwesterly boundary of said Lot" as shown on Plan C-6196. Because when Lots 7 and 10 were conveyed to Shaw's, Shaw's also owned Lot 2, Ravenna argues that any easements on Lots 7 and 10 arguably created by the 1976 deed were extinguished under the doctrine of merger. *See Soukup*, 159 N.H. at 17. Appletree assumes that Ravenna's

contention is correct and argues that the true source of its easements on Lots 7 and 10 is the 1984 deed conveying Lot 2 to Appletree's predecessor-in-interest.

Thus, Appletree contends that the same deed, the 1984 deed to its predecessor, is the source of all three of its drainage easements. The 1984 deed conveyed Lot 2:

> Together with the benefit of and subject to all rights, easements and restrictions of record including but not limited to the following:

> Easements, restrictions and covenants set forth in a deed from James A. Matarozzo, et al. to [Shaw's] recorded in Rockingham County Registry of Deeds at Volume 2266, page 441 [the 1976 deed] as affected by a Waiver of Right of First Refusal recorded herewith.

 We first examine whether the plain language of the 1984 deed was sufficient to create a drainage easement on Lot 6 for the benefit of Lot 2. The phrase "subject to all easements" in a conveyance means "subject to all *valid* easements." *Von Meding v. Strahl*, 30 N.W.2d 363, 369 (Mich. 1948) (quotation omitted), *overruled on other grounds by Harrison v. Heald*, 103 N.W.2d 348 (Mich. 1960), *as explained in Schmidt v. Eger*, 289 N.W.2d 851 (Mich. 1980); *see Kallas v. B & G Realty*, 485 N.W.2d 278, 281 (Wis. Ct. App. 1992).

However, the 1976 deed did not contain a *valid* drainage easement on Lot 6 for the benefit of Lot 2. Because the 1976 deed conveyed Lots 2 and 6 to a single owner, no easement was created by that deed.

> No man can have an easement in his own land. If the dominant and servient tenements are the property of the same owner, the exercise of the right, which in other cases would be the subject of an easement, is, during the continuance of his ownership, one of the ordinary rights of property only, which he may vary or determine at pleasure, without in any way increasing or diminishing those rights. The dominant and servient tenements must, therefore, belong to different persons; immediately they become the property of one person, the inferior right of easement is merged in the higher title of ownership.

*Stevens v. Dennett*, 51 N.H. 324, 330 (1872). In this case, as a result of the 1976 deed, the dominant estate (Lot 2) and the servient estate (Lot 6) did *not* "belong to different persons," so no easement was created. *Id.*; *see*

BRUCE & ELY, *supra* § 3.11, at 3-35 ("If a landowner attempts to create an express easement in favor of the landowner, the purported interest is a nullity."). Thus, the reference to the easements contained in the 1976 deed was insufficient to give rise to a drainage easement on Lot 6 for the benefit of Lot 2. Appletree "has cited no authority suggesting that a mere 'subject to' reference to a recorded document is sufficient to . . . resurrect an otherwise invalid easement." *Potts v. Smith*, No. 48928-3-I, 2002 WL 31186400, at *3 (Wash. Ct. App. Sept. 30, 2002).

We next examine whether the plain language of the 1984 deed was sufficient to convey drainage easements on Lots 7 and 10 for the benefit of Lot 2. While Appletree assumes that Ravenna is correct that any easements on Lots 7 and 10 were extinguished by merger when Lots 2, 7 and 10 came under common ownership, Appletree contends that the 1984 deed either revived the alleged drainage easements or created them anew.

The mere severance of Lot 2 from Lots 7 and 10 as a result of the 1984 conveyance was insufficient, as a matter of law, to revive the drainage easements on Lots 7 and 10. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 7.5 cmt. *b* at 366 (2000); *Breliant v. Preferred Equities Corp.*, 918 P.2d 314, 319 (Nev. 1996); *Capital Candy Company v. Savard*, 369 A.2d 1363, 1365 (Vt. 1976). "An easement destroyed by merger occurring when ownership of the servient and the dominant tenements comes into the same hands is not revived when the original tenements are later severed." BRUCE & ELY, *supra* § 10:27, at 10-82.

Additionally, the reference in the 1984 deed to the 1976 deed was also insufficient, as a matter of law, to revive the drainage easements on Lots 7 and 10. *See Capital Candy Company*, 369 A.2d at 1365; *Faulconer v. Williams*, 964 P.2d 246, 254-55 (Or. 1988) (citing cases). "[T]he mere reference to an extinguished easement in a deed is insufficient, as a matter of law, to revive the easement." *Breliant*, 918 P.2d at 319. As the Oregon Supreme Court has explained, "Generally, once an easement is extinguished, it is gone forever." *Faulconer*, 964 P.2d at 254.

The question remains, however, whether the 1984 deed's reference to the easements contained in the 1976 deed was sufficient to create the drainage easements on Lots 7 and 10 anew. When dominant and servient estates having merged are later severed, "a new easement may arise upon such severance by express provision or by implication." BRUCE & ELY, *supra* § 10:27, at 10-82; *see* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES), *supra* § 7.5 cmt. *b* at 366. In this case, Appletree relies upon the face of the 1984 deed, and does not argue that the drainage easements on Lots 7 and 10 arose by implication. We limit our analysis accordingly.

The language in the 1984 deed upon which Appletree relies states that Lot 2 is conveyed:

> Together with the benefit of and subject to all rights, easements and restrictions of record including but not limited to . . . [e]asements, restrictions and covenants set forth in a deed from James A. Matarozzo, et al. to George C. Shaw Co. recorded in Rockingham County Registry of Deeds at Volume 2266, page 441 [the 1976 deed] as affected by a Waiver of Right to First Refusal recorded herewith.

"The fundamental issue is whether [this] language was sufficient to bring . . . easement[s] into existence or whether the language merely acknowledge[s] the easement[s] as . . . previously existing right[s]" benefiting the dominant estate being conveyed. *Davis v. Henning*, 462 S.E.2d 106, 108 (Va. 1995). Under the circumstances of this case, we hold that the language did not create new drainage easements on Lots 7 and 10.

The language at issue is similar to the standard language in deeds used to put a buyer on notice of preexisting encumbrances that may apply to the land. *See Burdette v. Brush Mountain Estates, LLC*, 682 S.E.2d 549, 550-51, 554 (Va. 2009); *Wren Mtg. v. Timber Lakes & Timber Ridge Ass'n*, 612 S.W.2d 618, 620-21 (Tex. App. 1981) (deed stating that conveyance was "[s]ubject to the reservations, restrictions, and covenants of record against said property interest" was "merely precautionary," and did not result in property conveyed being burdened with restrictions imposed upon lots in subdivision (quotation and emphasis omitted)). *But see Davis*, 462 S.E.2d at 107, 108 (language stating that deed was subject to "that certain easement of right of way granted" in a particular deed was "not the normal 'boiler plate' language" (quotation omitted)). The "subject to" language in the 1984 deed does not mention a specific easement, plat or plan, but just states that Lot 2 is conveyed together with "all rights, easements and restrictions of record" including those set forth in the 1976 deed. *See Burdette*, 682 S.E.2d at 555.

■ Contrary to Appletree's assertions, no actual intention to create drainage easements on Lots 7 and 10 in Appletree's favor is apparent from the face of the 1984 deed. "Indeed, just the opposite is the case." *Faulconer*, 964 P.2d at 255. The 1984 deed merely refers to the 1976 deed and any valid easement contained therein. *See id.* While Shaw's may have been unaware that the drainage easements on Lots 7 and 10 arguably contained in the 1976 deed were extinguished by merger when it acquired ownership of both the dominant (Lot 2) and servient (Lots 7 and 10) tracts, "a mistaken belief cannot substitute for the requirement that the language evidence an

affirmative intent to create new rights." *Davis*, 462 S.E.2d at 108. "We look to what the words express, not what the grantor may have intended to express." *Id.*

When courts have deemed the language of a deed sufficient to create anew an easement extinguished by merger, the deed at issue has referred specifically to the disputed easement. *See Radovich v. Nuzhat*, 16 P.3d 687, 690-91 (Wash. Ct. App. 2001); *Doug's Electrical Service, Inc. v. Miller*, 83 S.W.3d 425, 427, 429-30 (Ark. Ct. App. 2002). In *Radovich*, for instance, after a parking easement was extinguished by merger, the owner of one of the dominant estates conveyed it to another "TOGETHER with the easements, hereditaments and appurtenances belonging to or inuring to the benefit of and pertaining to such real property" as more particularly described in Exhibit A to the deed. *Radovich*, 16 P.3d at 689 (quotation omitted). Exhibit A specifically stated that included in the property conveyed was "[a]n easement for the purpose of constructing, maintaining, repairing, and replacing a paved parking lot for the parking of motor vehicles and for ingress and egress to and from such paved parking." *Id.* (quotation omitted). The owner of the other dominant estate conveyed it in a deed that "specifically included an easement for a paved parking lot and included a complete legal description of the [servient estate]." *Id.* at 690.

The court ruled that the plain language of the deeds constituted "an express stipulation to reconvey the easement regardless of whether the same easement previously merged. Each deed clearly stated that it conveyed an easement, stated the purpose and scope of the easement, and gave a legal description of the servient estate." *Id.* at 691. This language, the court ruled, "effectively recreated the parking easement." *Id.*

By contrast to the specific language in *Radovich*, the 1984 deed in this case referred only generally to "all rights, easements and restrictions of record," including those contained in the 1976 deed. The 1984 deed did not identify, refer to, or in any way describe the drainage easements on Lots 7 and 10. Neither did the 1976 deed mention the drainage easements on Lots 7 and 10. It referred only to a drainage easement on Lot 6. While the 1976 deed referred to Plan C-6196, and Plan C-6196 depicted drainage easements on Lots 7 and 10, Plan C-6196 did not indicate which lots these drainage easements were intended to benefit.

Under all of these circumstances, we conclude that the plain language of the 1984 deed, together with the circumstances surrounding it, do not express an affirmative intent to create new drainage easements on Lots 7

and 10 for the benefit of Lot 2. In light of our decision, we need not reach Ravenna's alternative appellate arguments.

*Reversed.*

DUGGAN, HICKS and LYNN, JJ., concurred.